**Anthony David ALEXANDER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–95–01266–CR.**

Court of Appeals of Texas,
Dallas.

July 9, 1997.

Lawrence G. Boyd, Dallas, for Appellant.

Sue Korioth, Assistant District Attorney, Dallas, for State.

Before MALONEY, CHAPMAN and MOSELEY, JJ.

## OPINION

MOSELEY, Justice.

Anthony David Alexander appeals his conviction for driving while intoxicated (DWI). Appellant's only point of error is that the trial court erred in refusing to allow appellant to cross-examine the arresting officer, who was the State's sole witness, regarding a departmental directive establishing quotas for DWI arrests that was in place at the time of his arrest. For the reasons set forth below, we reverse the judgment of the trial court and remand the cause for a new trial on the merits.

On May 8, 1997, we issued an order striking the State's brief. Accordingly, the State's brief was not considered in deciding this appeal.

## RIGHT TO CONFRONTATION

In his sole point of error, appellant contends he was denied the right to confrontation because the evidence of a quota system for DWI arrests is relevant to show the arresting officer's possible motive, bias, or interest to testify falsely.

## FACTS

Before trial, the trial court granted the State's oral motion in limine to prevent appellant from presenting evidence regarding a quota system for DWI arrests until the admissibility of the evidence had been tested outside the jury's presence. Mitchell Gatson, a Dallas police officer, testified. During

cross-examination, the trial court dismissed the jury and defense counsel elicited the following testimony:

Q. [Defense counsel] At the time of this arrest will you agree there was a directive issued from Officer Bowser regarding some sort of quota system?

A. [Gatson] Yes.

Q. Tell the court about that.

A. *The directive basically stated if you didn't meet a certain DWI number—the number percentage per day that you couldn't do outside employment, even volunteer work.*

Q. *And that was during this period of this arrest?*

A. *Yes, it was.*

Q. Who was the—was it your sergeant that issued that directive?

A. It came from Captain Belton, Lt. Benton and Sgt. Bowser. Sgt. Bowser was the one who put it in writing and signed his name to the sheet.

Q. I hand you Defendant's Exhibit 1.[1] Is that the directive that was sent out to the task force officers?

A. Yes, it was. Yes, that's it.

The State then objected to the evidence on the basis of relevance and asserted that there had been no evidence as to when the directive was issued and the dates that it was in effect. Defense counsel responded by continuing to question Gatson:

Q. [Defense counsel] Do you remember the dates this directive was issued for?

A. Not the exact date. I just know it was sometime during that period. You're going to have to—I think you're going to have to get Belton, Bowser and Benton to explain that thing to you.

Q. I just want to know—first off, let me hand you Defendant's Exhibit 1. Is that the exact copy of the directive you got?

A. Yes.

Q. Does he [sic] show December 1 '94 through December 3rd '94?

A. Yes. See, it shows a date. This shows the DWI report but then I'm not sure—I believe the date that this actually started was after the first.

Q. First of which month?

A. It was after the first—I think it was after the first of December.

The trial court sustained the State's relevance objection.

## DISCUSSION

### I. Applicable Law

■ The Sixth Amendment to the United States Constitution guarantees a defendant the right to confront the witnesses against him.[2] The right of confrontation is violated when appropriate cross-examination is limited.[3] Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.[4] Because the partiality of a witness is " 'always relevant as discrediting the witness and affecting the weight of his testimony,' "[5] the right of cross-examination extends to any matter that could reflect on the witness's credibility.[6] Thus, the scope of cross-examination encompasses all facts and circumstances that, when tested by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish only one side of the cause.[7] Therefore, without the necessity of laying a

1. The DWI directive was not admitted into evidence.

2. *See* U.S. Const. amend. VI; *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965).

3. *Carroll v. State,* 916 S.W.2d 494, 497 (Tex. Crim.App.1996).

4. *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

5. *Gannaway v. State,* 823 S.W.2d 675, 678 (Tex. App.-Dallas 1991, pet. ref'd) (quoting *Davis,* 415 U.S. at 315, 94 S.Ct. at 1109–10); *see Coleman v. State,* 545 S.W.2d 831, 833 (Tex.Crim.App.1977) (stating that the bias of a prosecuting witness is never a collateral matter).

6. *Virts v. State,* 739 S.W.2d 25, 28 (Tex.Crim. App.1987).

7. *Carroll,* 916 S.W.2d at 497–98.

predicate,[8] a defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to falsify his testimony.[9]

The right to cross-examine a witness, however, is not unlimited. A trial court may permissibly limit the scope of cross-examination to prevent harassment, prejudice, confusion of the issues, harm to the witness, and repetitive or marginally relevant interrogation.[10]

## II. Analysis

■ Appellant's defensive theory was that because of the DWI directive, Gatson had a motive to falsely accuse appellant of DWI. Our examination of the record indicates that the excluded cross-examination was not unduly harassing or prejudicial, did not have a tendency to confuse the issues or impair the safety of the testifying witness, was not repetitive of any prior testimony, and was fully relevant to expose the officer's possible reasons to testify falsely against appellant. We, therefore, conclude the trial court abused its discretion by refusing to allow appellant to cross-examine Gatson regarding the DWI directive.

## III. Harm Analysis

■ Having concluded that appellant was improperly denied the opportunity to cross-examine the State's only witness, we must determine whether such denial was harmful.[11] Delaware v. Van Arsdall [12] sets forth the proper analysis for determining whether a limitation of cross-examination is harmful.[13] First, the reviewing court must assume that the damaging potential of the cross-examination was fully realized.[14] Second, with that assumption in mind, the error is reviewed in light of the following factors: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.[15] Finally, the reviewing court then determines whether the error was harmless beyond a reasonable doubt.[16] To perform this analysis, we review the entire record.

### A. Summary of the Evidence

Gatson testified that he was on duty at 2 a.m. on December 16, 1994. When he first saw appellant's car, appellant was driving down Cedar Springs Road in the middle of the roadway, straddling the center line. He then observed appellant make a left turn from the right-hand lane, as opposed to the designated turn lane, and begin driving on the wrong side of the road down Maple Avenue.[17] After Gatson activated his lights, appellant turned left onto Mahon and safely stopped his car.

Gatson then asked appellant for his driver's license and asked him to step out of the car. Once appellant emerged from the car and handed Gatson his license, Gatson told him that he smelled alcohol on his breath. Appellant admitted that he had been to a party where he had been drinking. Gatson told appellant that he wanted to conduct some field sobriety tests. Appellant then performed the horizontal gaze nystagmus test, which indicated that appellant had six clues out of six clues. Appellant refused to

---

8. Coleman, 545 S.W.2d at 833.

9. Carroll, 916 S.W.2d at 497.

10. Delaware v. Van Arsdall, 475 U.S. 673, 682, 106 S.Ct. 1431, 1436–37, 89 L.Ed.2d 674 (1986); Carroll, 916 S.W.2d at 498.

11. See Love v. State, 861 S.W.2d 899, 904 (Tex. Crim.App.1993); Shelby v. State, 819 S.W.2d 544, 547 (Tex.Crim.App.1991); TEX.R.APP. P. 81(b)(2).

12. 475 U.S. at 684, 106 S.Ct. at 1438.

13. Shelby, 819 S.W.2d at 547.

14. Id.

15. Id.

16. Id.

17. Gatson's initial testimony was that he observed appellant make a right turn from the left lane. His later testimony and the demonstrative evidence reflects that appellant made a left turn onto Maple Avenue.

perform the stationary balance test, a counting exercise, and a recitation of the alphabet. Gatson then placed appellant under arrest for DWI.

Gatson next asked the three passengers in appellant's car whether they had been drinking, and they responded affirmatively. Gatson testified that the passengers were intoxicated and that he could have arrested them for public intoxication. He, however, did not find it necessary to arrest the passengers, as long as they had a ride home.

After the passengers were freed to go, Gatson took appellant to the intoxilyzer room in Lew Sterrett (jail) to make a videotape and give appellant his Miranda[18] warnings. During the taping, appellant was asked to read the "Six Flags card," take a breath or blood test, and perform more field sobriety tests. Appellant refused to read the card and take the tests. Appellant also refused to waive his right to an attorney. Gatson observed that appellant's eyes were bloodshot and that his speech was resisted. Because of his observations throughout the evening and appellant's refusal to take the requested sobriety tests, Gatson concluded that appellant did not have the normal use of his mental and physical faculties.

On cross-examination, Gatson admitted that appellant's speech was not slurred, he did not stagger as he walked, he had no problem getting out of the car, he did not lean against the car or keep his hands on the car, and he did not leave the car in gear. He also admitted that his offense report[19] did not reflect that appellant was straddling the center line but instead stated that appellant was driving "on the yellow line." He further admitted that appellant's eyes are hazel or brown and that his offense report reflected that appellant's eyes are blue. He testified that appellant was driving the correct speed and made the turn onto Maple Avenue during a green light. He could not say whether he believed that an invocation of the right to remain silent at the scene of a traffic stop was an indication of guilt. At the time of the stop, Gatson was aware that appellant was an attorney.

Appellant's wife, Lori Alexander, testified that she was a passenger inside the car appellant was driving at the time Gatson pulled appellant over. She had asked appellant to take her to a champagne tasting dinner at the Hotel St. Germaine. During the dinner, they were given five half glasses of premium champagne to taste. She testified that they ate a lot of food and that the dinner lasted from 6:30 to 9:30 in the evening. After the dinner, they walked to Old Warsaw where they stayed for about two hours and shared a flaming coffee drink. They then drove a short distance to St. Tropez with another couple to go dancing. Appellant and his wife each had one wine spritzer at St. Tropez. Mrs. Alexander testified that she did not feel that she was affected by the alcohol. They left St. Tropez around 1:30 or 1:45 in the morning. As they were driving back to the Hotel St. Germaine to drop off the other couple, they both noticed the police car behind them on Cedar Springs Road. She testified that there was nothing unusual about appellant's driving or his turn onto Maple Avenue. She also stated that appellant's speech and walk were normal.

She testified that Gatson did not look at her eyes and did not have her perform any field sobriety tests. He did, however, ask if she had been drinking, and when she responded that she had, he told her that he could not allow her to drive herself home. Despite her belief that she could drive herself home, she called a cab because of Gatson's statements.

Appellant testified he did not believe that he was affected by alcohol at the time of the stop. He refused to take any of the field sobriety tests because he believed the officer had no reason to stop him and he resented being pulled over for no reason. Contrary to Gatson's testimony, appellant testified that Gatson did not perform a horizontal gaze nystagmus test and that his eyes are dark brown. He further stated that he did not cross the yellow line on Cedar Springs Road,

---

**18.** *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612–13, 16 L.Ed.2d 694 (1966).

**19.** Gatson's offense report was not admitted into evidence.

that his turn onto Maple Avenue was proper, that he did not drive down the middle of Maple Avenue, and that he had already stopped his car when Gatson turned on his lights. Appellant also testified that he did not finish the last glass of champagne he was given because it was too sweet.

### B. Application of Van Arsdall factors

We first assume that the jury heard appellant's cross-examination of Gatson regarding the DWI directive in place at the time of appellant's arrest. We next consider the *Van Arsdall* factors.

#### 1. The Importance of the Witness's Testimony in the Prosecution's Case

As the State's only witness, Gatson's testimony was critical to the State's case. There is no scientific evidence, such as breath or blood test results, to independently confirm appellant was intoxicated. Without Gatson's testimony, appellant would not have been convicted of DWI.

#### 2. Whether the Testimony Was Cumulative

Additionally, as the State's sole witness, Gatson's testimony was not cumulative. His testimony contains the only evidence that appellant committed a series of traffic violations before being stopped and that appellant failed the horizontal gaze nystagmus test.

#### 3. The Presence or Absence of Evidence Corroborating or Contradicting the Testimony of the Witness on Material Points

Because there were no other witnesses for the State, there is no testimony to corroborate Gatson's statements. Additionally, as noted above, there are no breath or blood test results to independently indicate that appellant was intoxicated. The videotape of appellant reveals only that appellant, while sitting down, refused to take any tests; his speech was not slurred and there is no apparent outward indication that he was intoxicated.

Additionally, there are discrepancies between Gatson's trial testimony that appellant was straddling the center line and his offense report that indicates that appellant was driving on the yellow line. Both appellant and his wife testified that appellant's driving was normal. Furthermore, Gatson's offense report indicates that appellant's eyes are blue when, in fact, they are dark brown. That Gatson was mistaken as to the color of appellant's eyes lends credence to appellant's contention that Gatson never administered the horizontal gaze nystagmus test.

#### 4. The Extent of Cross–Examination Otherwise Permitted

Appellant was otherwise permitted to fully cross-examine Gatson.

#### 5. The Overall Strength of the Prosecution's Case

The prosecution's overall case must be considered weak. Gatson was the only witness against appellant. Gatson's trial testimony is inconsistent with his offense report. Additionally, the incorrect statement in the offense report that appellant's eyes are blue leads to inferences that Gatson may not have administered the horizontal gaze nystagmus test.

After considering the entire record, we cannot conclude beyond a reasonable doubt that the trial court's improper limitation of appellant's fundamental right to cross-examination was harmless. Accordingly, we sustain appellant's sole point of error.

### CONCLUSION

Because we sustain appellant's only point of error, we reverse the trial court's judgment and remand the cause to the trial court for a new trial on the merits.