**James Eldon PAGE, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–96–349–CR.**

Court of Appeals of Texas,
Fort Worth.

Oct. 7, 1999.

Rehearing Overruled Dec. 13, 1999.

204

McColl & McColloch and Arch C. McColl, III, Dallas, for Appellant.

Bruce Isaacks, Criminal District Attorney and Yolanda M. Joosten, Doug Wilder, and James Angelino, Asst. Dist. Attys., Denton, Matthew Paul, State Pros. Atty., Austin, for Appellee.

## OPINION

WILLIAM BRIGHAM, Justice.

A jury convicted Appellant James Eldon Page of driving while intoxicated (DWI). The trial court assessed punishment at 60 days' confinement, probated for 24 months, and a $500 fine. Appellant presents thirteen points for our review. We affirm.

## I. EXCULPATORY EVIDENCE

In his first four points, Appellant contends that the trial court reversibly erred by not allowing any discovery and not including in the record requested information regarding the arresting officer's arrest reports over a six-month period to attempt to show the officer's bias. Appellant further asserts in point thirteen that the trial court erred by failing to allow him to include in the appellate record the subpoenaed information regarding the existence of a DWI task force. Appellant claims that the DWI task force information is material in that it could have been used to impeach the arresting officer by showing that he was under a DWI quota directive and, thus, had a motive to falsify his report charging Appellant with DWI.

Appellant was arrested by Lewisville Police Officer Paul Nathan for DWI on March 28, 1992. In Officer Nathan's arrest report, he quoted Appellant as saying, "I've had too much to drink. I'm drunk, and I've been drinking at Sneaky Pete's." Before trial, Appellant requested the following documents by subpoena duces tecum:

[A]ll documents ..., records and notes concerning any DWI task force, or equivalent, existing [on March 28, 1992], and comprised in whole or in part of members of the Lewisville Police Department, including any goals, either quantitative or qualitative, concerning the amount or type of arrests to be made, as well as the actual grants of funding for such task force or equivalent.

. . . .

[A]ll documents concerning ... [Appellant's] arrest on March 28, 1992, including but not limited to all arrest or offense reports filed by [Officer Nathan] from and including 12/28/91 through and including 6/28/92. . . .

The trial court granted the State's motions for protective order and denied Appellant's oral request for the court to either inspect the documents in camera, or have the State produce the documents for the limited purpose of the appellate record.

### A. DISCOVERY IN CRIMINAL CASES

 It is settled law that a defendant's due process rights are violated if he does not obtain, upon request, evidence in the State's possession favorable to him "where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). But there is no general right to discovery in a criminal case, and *Brady* does not create one. *See Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977). "To invoke *Brady,* the accused must present evidence that: (1) the prosecution suppressed or withheld evidence; (2) this evidence would have been favorable to the accused; and (3) this evidence would have been material to the accused's defense." *Cruz v. State,* 838 S.W.2d 682, 686 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd) (citing *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972)). Evidence is material if "there is a reasonable probability that, [had the evidence been disclosed to the defense], the result of the proceeding would have been different.... [A] 'reasonable probability' [is] 'a probability sufficient to undermine confidence in the outcome.'" *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *see also Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). *Brady* evidence includes impeachment evidence as well as exculpatory evidence. *See Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380.

## B. OFFICER NATHAN'S ARREST REPORTS

■ Appellant subpoenaed Officer Nathan's arrest reports for a six-month period surrounding Appellant's arrest. He later narrowed his request to only Officer Nathan's DWI arrest reports for the 30–day period surrounding Appellant's arrest. Appellant asserted that he was entitled to discover these reports, or at least to have the court review them in camera, because "I think the officer lied." Appellant further stated that "I think I can show through the subpoenaed documents that over a six-month period, he has had other people say the identical thing or similar things, because it's—it's not credible." Appellant presents to this court three things that he asserts constitute a showing that the requested documents would yield the result he suspected:

▶ The videotape taken of Appellant about 15 minutes after his arrest, which Appellant asserts contradicts any assertion that he was intoxicated;

▶ Appellant's invocation of his constitutional right to remain silent after his arrest; and

▶ Officer Nathan's alleged statement to Appellant, "You guys in your ties," which Appellant argues demonstrates a bias against "white-collar types."

We hold that, even assuming the requested arrest reports contained the information alleged by Appellant, the reports would not be material to the guilt or punishment of Appellant nor could they reasonably be used to impeach Officer Nathan. None of the factors cited above indicate even a remote likelihood that Officer Nathan was not being truthful in the arrest report, much less that he has been untruthful in making other unrelated arrests. Appellant effectively conceded this when asked by the trial court, "So it's your representation to the Court that you're aware of other situations in which the same circumstances arose and comparable statements were made in similar—or is that the representation that you're aware of that?" to which Appellant replied, "No. That is not my representation."

■ There is no evidence in the record that shows Officer Nathan falsified any arrest report. Consequently, there is no showing that Officer Nathan's DWI arrest reports are material to this case. We will not order the State to produce information under *Brady* based merely on Appellant's speculation that the requested information contained exculpatory evidence. *See Gowan v. State,* 927 S.W.2d 246, 250 (Tex. App.—Fort Worth 1996, pet. ref'd) (refusing to make "leap of faith" necessary to assume police file on seven unrelated rapes would show that rape for which defendant was charged was committed by another

assailant). We hold that the trial court did not err by granting the State's motions for protection from the subpoena duces tecum. We overrule points one, two, three, and four.

## C. EVIDENCE OF A DWI TASK FORCE

■ Appellant asserts that the trial court erred in failing to order the State to produce DWI task force information for an in camera review. According to Appellant, DWI task force information is material in that it could be used to impeach Officer Nathan by showing that he was under a DWI quota directive and, thus, had a motive to falsify his report charging Appellant with DWI.

At the hearing on the State's motion for protective order from Appellant's generalized request for all records concerning DWI task forces or quotas, an assistant city attorney[1] acknowledged that "there may be information responsive to the request." However, Officer Nathan testified at a later pretrial hearing that neither he nor the Lewisville Police Department was participating in any DWI task force at the time of the arrest:

Q. (By [defense counsel]) You were aware that there was a DWI task force at the time this arrest was made, correct?

A. County?

Q. County. You were part of it, correct?

A. No.

Q. You weren't part of it?

A. No.

Q. So the one question I want to ask: so there was no goal stated or unstated that you had as part of any DWI task force?

A. Not as a DWI task force member, no.

Q. As to make any number of arrests?

A. No.

Q. And there was no federal funding contingent on any number of arrests?

A. Not for me, no.

Q. Or any part of the Lewisville Police Department?

A. I don't think we were participating in a DWI task force at the time.

■ We recognize that if Officer Nathan had been a DWI task force member or had a quota, the task force records would have been discoverable because they would have been "fully relevant to expose the officer's possible reasons to testify falsely against appellant." *Alexander v. State,* 949 S.W.2d 772, 775 (Tex.App.— Dallas 1997, pet. ref'd). However, there is no constitutional obligation on the part of the trial court to peruse the prosecutor's file for exculpatory evidence that does not exist. *See Ransonette v. State,* 550 S.W.2d 36, 40 (Tex.Crim.App.1976); *see also Rigsby v. State,* 654 S.W.2d 737, 739 (Tex. App.—Houston [14th Dist.] 1983, no pet.). The testimony presented to the trial court that Officer Nathan was not a member of any DWI task force and did not have a quota is uncontroverted and thus conclusively established that the requested documents relating to Officer Nathan are non-existent. Although it could be said that the assistant city attorney contradicted Officer Nathan's testimony that there was no DWI task force, the trial court was in the best position to determine credibility. We will not second guess its implied finding that Officer Nathan's testimony was reliable. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997); *see also State v. Stevenson,* 993 S.W.2d 857, 863 (Tex. App.—Fort Worth 1999, no pet.) ("Unlike the trial judge, we are not in a position to judge [an arresting police officer's] credibility and demeanor."). We hold that the trial court, as the sole judge of the credibility of the witnesses who testified about

---

1. The assistant city attorney appeared, with the permission of the court, regarding the State's motions for protective order.

the existence of DWI task force information relating to Officer Nathan, did not abuse its discretion in failing to conduct an in camera review of the requested documents because the record shows that the documents do not exist. Consequently, we overrule point thirteen.

## II. STANDING

In his fifth point, Appellant asserts that the State has no standing to respond to the above points because the city attorney filed the motions for protection. Knowledge of prosecutors and police is imputed to the State. *See Ex parte Castellano*, 863 S.W.2d 476, 481 (Tex.Crim.App.1993); *see also Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). In *Adams*, the Court of Criminal Appeals noted that for the purposes of imputing knowledge to the prosecution, courts have "declined to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel." *Ex parte Adams*, 768 S.W.2d 281, 292 (Tex.Crim.App.1989) (citing *United States v. Antone*, 603 F.2d 566, 569 (5th Cir.1979)); *see also Ex parte Brandley*, 781 S.W.2d 886, 892 n. 7 (Tex.Crim.App.1989), *cert. denied*, 498 U.S. 817, 111 S.Ct. 61, 112 L.Ed.2d 35 (1990). "It is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge will be imputed to state prosecutors." *Adams*, 768 S.W.2d at 292 (citing *Williams v. Griswald*, 743 F.2d 1533, 1542 (11th Cir.1984)). Furthermore, Appellant presents no authority for his proposition. *See* Tex.R.App. P. 38.1(h). Therefore, we overrule point five.

## III. SUFFICIENCY OF THE EVIDENCE

In points eleven and twelve, Appellant challenges the legal and factual sufficiency of the evidence to support the verdict.

### A. STANDARDS OF REVIEW

In reviewing the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict. *See Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Crim.App.), *cert. denied*, 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence without looking through the prism of "in the light most favorable to the prosecution." *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App.1996) (citing *Stone v. State*, 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd, untimely filed)). We may only set aside the verdict if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.* In performing this review, we are to give "appropriate deference" to the fact finder. *Id.* at 136.

### B. THE EVIDENCE AT TRIAL

Officer Nathan testified at trial that he received continuing training in DWI detection. While he was patrolling at about 11:55 p.m. on March 28, 1992, he observed a car in front of him run a stop sign. The officer then activated his overhead lights. While he was following the car with his lights on, the car did not slow down right away, but was weaving between the lanes at least twice before pulling over. When Officer Nathan got to the

car, the window was down and he asked Appellant for his driver's license and proof of insurance. At that time, Officer Nathan testified that Appellant told him, "I've had too much to drink. I'm drunk, and I've been drinking at Sneaky Pete's." Appellant testified at trial that not only had he been drinking at Sneaky Pete's, he also had a beer at a bar called Hiccups after he left Sneaky Pete's. Officer Nathan asked Appellant to step out of the car and administered field sobriety tests. Appellant was unsteady, swaying, and staggering, his eyes were red and glassy, and his speech was slurred and a little muffled. Officer Nathan administered (1) the horizontal gaze nystagmus test, (2) the walk-and-turn test, (3) the alphabet recitation test, (4) the backwards counting test, and (5) the one-leg-stand test. Appellant failed all five tests and was then placed under arrest. Once he was under arrest, Appellant refused to talk or answer any more questions.

When Appellant arrived at the station, he was taken into the "intoxilyzer room" with Officer Billy Goodman. Officer Goodman made a videotape while Appellant was in the room, which was shown to the jury. Appellant received *Miranda* warnings on the video and invoked his right to silence. Officer Goodman continued to ask Appellant eight or nine questions, resulting in Appellant being shown sticking his tongue out.

### C. APPLICATION

Appellant contends that this evidence was not legally or factually sufficient to support the jury's verdict. We disagree. Because there was no scientific evidence in this case, it was entirely a question of credibility. We may not sit as a thirteenth juror and decide whether Appellant's version or the Officers' version was more credible. Viewing this evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Further, Appellant did not present such overwhelming evidence to the contrary that we must hold the verdict to be manifestly unjust. Therefore, we overrule points eleven and twelve.

## IV. LEGALITY OF APPELLANT'S ARREST

In his seventh point, Appellant challenges the denial of his motion to suppress. He contends that Nathan did not have sufficient legal cause to stop him; thus, the subsequently obtained evidence was inadmissible. Specifically, Appellant asserted in the trial court and renews on appeal two contentions: (1) the stop sign that Appellant failed to stop at was not placed by city ordinance and, therefore, imposed no obligation to stop and (2) no one was placed in danger by Appellant's crossing between lanes and therefore such crossing did not constitute a crime. Appellant presents no basis or authority for this second contention.

An investigatory stop is justified if the officer, based upon specific and articulable facts, reasonably concludes that the detained person may be associated with a crime. See Davis v. State, 829 S.W.2d 218, 219 (Tex.Crim.App.1992) (op. on reh'g). We afford deference to the trial court's determination of the historical facts surrounding the stop, but we review the determination of reasonable suspicion de novo. See Guzman, 955 S.W.2d at 87 (citing Ornelas v. United States, 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911). Reasonable suspicion is determined by the totality of the circumstances, and we must look at all of the facts together to make the reasonable suspicion determination. See Loesch v. State, 958 S.W.2d 830, 832 (Tex.Crim.App.1997).

Appellant presented extensive evidence at the pretrial hearing on the unlawfulness of the stop sign, which we will not recite here. Even if the stop sign was in fact not legally placed at the intersection, that fact would be a defense to a prosecution for failing to stop, but has no bearing on the reasonableness of Officer Nathan's conclu-

sion that running it was an offense. Officer Nathan testified at the hearing on the motion to suppress that he stopped Appellant because he saw Appellant fail to stop at a stop sign and weave in and out of a single lane on two or more occasions. He further testified that he believed the stop sign to be legally placed and effective at the time of the stop and arrest. Appellant does not challenge that probable cause existed for his arrest, but merely that his initial stop was illegal. We disagree.

Appellant did not testify at the hearing on the motion to suppress, and consequently did not contradict any of Officer Nathan's testimony about the reasons he stopped Appellant. We hold that the stop was based on specific, articulable facts that constituted sufficient reasonable suspicion. The trial court did not abuse its discretion by failing to suppress the evidence acquired as a result of the traffic stop. We overrule point seven.

## V. THE STATE'S CHALLENGE FOR CAUSE

 In point six, Appellant challenges the trial court's granting of the State's challenge for cause of venireperson Fuss. The State asserts that Fuss (1) required an objective measure of proof of intoxication, (2) expressed a misunderstanding of the State's burden of proof by stating that clear and convincing is the same as beyond a reasonable doubt, and (3) vacillated in his responses to the State and the defense about whether he would require evidence of Appellant's behavior when sober before he would assess guilt.

 A venireperson may be challenged for cause if he or she demonstrates a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment. *See* TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) (Vernon Supp.1999). We may only reverse a trial court's ruling on a challenge for cause on a showing of an abuse of discretion. *See Staley v. State,* 887 S.W.2d 885, 893 (Tex.Crim.App.1994), *cert. denied,* 514

U.S. 1020, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995); *Jones v. State,* 843 S.W.2d 487, 497 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). Further, we must defer to the trial court's determination because it is in a position to judge the demeanor and sincerity of the venireperson. *See Butler v. State,* 872 S.W.2d 227, 234 (Tex.Crim.App. 1994), *cert. denied,* 513 U.S. 1157, 115 S.Ct. 1115, 130 L.Ed.2d 1079 (1995); *Montoya v. State,* 810 S.W.2d 160, 167 (Tex.Crim.App. 1989), *cert. denied,* 502 U.S. 961, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991).

Venireperson Fuss made the following statements:

▶ He would require an objective measure of intoxication, not subjective.

▶ He wouldn't specifically need a blood or breath test, but would have to see specific behavior that showed intoxication beyond a reasonable doubt.

▶ He wouldn't absolutely hold it against the State that they didn't bring evidence of a blood or breath test, but he would have to be convinced.

▶ He believed that clear and convincing was the same as beyond a reasonable doubt.

▶ Regardless of this belief, he understood they were different and could apply the law as given to him by the judge.

▶ He would require evidence of what Appellant was like when he was sober and normal in order to be fair and impartial.

Based on Fuss's answers, we hold that the trial court did not abuse its discretion by granting the State's challenge for cause. We overrule point six.

## VI. CLOSING ARGUMENTS

 In points nine and ten, Appellant complains that the trial court erred first by allowing the State to "effectively [comment] that defense counsel manufactured evidence," and second by allowing the State to "knowingly ma[ke] a bad faith comment … in order to leave a false

impression with the jury." Proper jury argument may fall in any of four categories: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) response to argument of opposing counsel, and (4) pleas for law enforcement. *See Felder v. State,* 848 S.W.2d 85, 94–95 (Tex. Crim.App.1992), *cert. denied,* 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993).

### A. MANUFACTURED EVIDENCE

■ Appellant contends in point nine that the State effectively accused him of manufacturing evidence:

> [STATE]: ... I want to comment on some of this evidence for you. This impound sheet. What do we know about this impound sheet? I want you to take this back and look at it and look at the signature. Whoever made this sheet signed it, and this person did not testify. So we don't know how or when this was filled out. We don't know, as defense counsel highlighted this time, what this time actually represents.
>
> What we do know is that the officer stated, I haven't dealt with an impound sheet in a couple [of] years. Yeah, that looks right. He doesn't know.
>
> [DEFENSE COUNSEL]: Your Honor, he testified his fellow officer at the scene would have signed it. That was his testimony.
>
> THE COURT: I'll overrule the objection. The jurors will recall the evidence.
>
> Go ahead.
>
> [STATE]: So is this this case-breaking piece of evidence? It is not. We don't know what this time actually means. There was no testimony from anybody of who put that there. That's one piece.
>
> What's this do for us? As evidence, absolutely nothing. What do these do for us? Kind of shows the road. Outside of that, absolutely nothing. The evidence that the defense has brought to you, they're smoke screens, ladies and gentlemen.

The State's commentary about the impound sheet was entirely proper because it was responding directly to Appellant's closing arguments about the same evidence: "What's the time there? 12:14. What does that corroborate? That citizen's recollection that they left, more or less, together, the tow truck and [Appellant] going downtown in handcuffs. It happened about the same time." Appellant argued that the time on the impound sheet was material; the State simply argued that it was not.

The remainder of the State's comments seem to be directed to photographs that were introduced. However, we do not agree that these statements accused Appellant of manufacturing evidence. The State argued that the exhibits were irrelevant and perhaps suggested that their use was a diversionary tactic, but stopped short of accusing Appellant of any wrongdoing. Therefore, we overrule point nine.

### B. INTENTIONALLY LEAVING A FALSE IMPRESSION WITH THE JURY

■ Point ten presents a different question. Appellant contends that the State intentionally and in bad faith used the objective evidence to leave a knowingly false impression with the jury during closing argument:

> [STATE]: ... But when you look at this officer, this man we're supposed to believe said, you guys in your ties. Well, you guys in your ties—do you see a tie on him? I don't see a tie on him. Where did "you guys in your ties" come from?
>
> [DEFENSE COUNSEL]: Your Honor, could we have an instruction that they take your necktie off when you come into jail?
>
> [STATE]: There's no evidence of that, your Honor.
>
> [DEFENSE COUNSEL]: Well, Judge, that's a standard, well-known thing. Otherwise, it would be a violation of their regulations. And it's misleading to this jury.

THE COURT: I'll overrule the objection.

Appellant relies on *Ex parte Adams* for his proposition. In *Adams*, a habeas corpus proceeding, a prosecution witness was found to have perjured herself during her testimony at trial and to have given a prior inconsistent statement. *Adams*, 768 S.W.2d at 286. The court found that the State had knowledge of the perjury and the inconsistent statement at the time of her testimony and failed to disclose the evidence. *Id.* at 287.

In this case, Appellant brought forward no evidence, before, during, or after trial, supporting his assertions that his tie was removed as part of a booking procedure. Thus, we are unable to conclude that the State intentionally or at all mischaracterized or misrepresented the evidence. The State's comment was objectively correct as to whether Appellant was in fact wearing a tie in the videotape. If indeed there was some evidence to the contrary, we could not condone the State's comments. However, the record is free of any evidence of Appellant wearing a tie when he was arrested. We overrule point ten.

## VII. *EX POST FACTO* IMPLICATIONS OF APPELLANT'S PROBATION TERMS

In his eighth point, Appellant charges that the trial court violated the *ex post facto* clauses of the United States and Texas Constitutions by imposing terms of probation in effect at the time of trial in 1996 as opposed to those in effect at the time of the offense in 1992. *See* Tex.Code Crim. Proc. Ann. art. 42.12, § 11(a)(14) (Vernon Supp.1999). Specifically, he challenges the imposition of urinalysis testing for alcohol because this was not a statutory condition of probation in 1992. A law can violate the *ex post facto* clause in one of three ways: (1) by punishing as a crime an act previously committed which was innocent when done, (2) by changing the punishment and inflicting a greater punishment than the law attached to a crime when committed, or (3) by depriving a defendant of any defense that was available at the time of the offense. *See Johnson v. State*, 930 S.W.2d 589, 591 (Tex. Crim.App.1996).

The State argues there is no violation because, at the time of the offense, the statutory conditions did include urinalysis for controlled substances and because the trial court has always had the power to impose other reasonable conditions of probation in addition to those listed in the code. Furthermore, the State argues, urinalysis for the presence of alcohol was held to be a reasonable condition before 1992. *See Clay v. State*, 710 S.W.2d 119, 120 (Tex.App.—Waco 1986, no pet.); *Macias v. State*, 649 S.W.2d 150, 151–52 (Tex.App.— El Paso 1983, no pet.). We agree. Because Appellant could have been subjected to urinalysis under the 1992 version to test for controlled substances, we fail to see how this probationary condition imposes any additional burden or punishment on Appellant. We overrule point eight.

## VIII. CONCLUSION

Because we have overruled all of Appellant's points, we affirm the trial court's judgment.

DAUPHINOT, J. filed a dissenting opinion.

RICHARDS, J. filed a dissenting opinion in which LIVINGSTON, J. joins.

DAUPHINOT, Justice, dissenting.

I write in dissent because I believe the majority applies the wrong standard for determining Appellant's thirteenth point on appeal, in which Appellant argues that the trial court erred in failing to require production of DWI task force information for an in camera inspection.

While the majority correctly states that "there is no constitutional obligation on the part of the trial court to peruse the prosecutor's file for exculpatory evidence that does not exist," this proposition is not

found in *Ransonette v. State*,[1] the case cited by the majority. The *Ransonette* court actually held that

> [t]here is no constitutional requirement that the prosecutor must make a complete and detailed accounting to the defense of all police investigatory work on a case. The prosecutor has not violated his constitutional duty of disclosure unless his omission is sufficiently significant to result in the denial of the defendant's right to a fair trial. Likewise, we know of no constitutional obligation of the trial court to peruse the prosecutor's file for exculpatory evidence in the absence of a specific request supported by *some showing that such evidence exists*.[2]

In this case, there is "some showing" that the task force documents exist.

The majority concludes that the testimony of the arresting officer, Paul Nathan (Officer Nathan), that he was not a member of any DWI task force and did not have a quota is uncontroverted and thus "conclusively established that the requested documents relating to Officer Nathan are nonexistent." The majority reaches this conclusion despite Officer Nathan's evasive answers, his admission that he is not sure of the exact dates the City of Lewisville (Lewisville) participated in the DWI task force, and the testimony of Kimberly Cawley (Cawley), the assistant city attorney for Lewisville, that directly contradicts Officer Nathan's testimony.

Officer Nathan's testimony is puzzling. When asked if he was aware that there was a DWI task force at the time of Appellant's arrest, his response was to ask if Appellant's attorney meant a county task force. When the definition of DWI task force was limited to county task force, Officer Nathan denied that he was a part of it. When asked if he had a "goal stated or unstated . . . as part of any DWI task force," he did not reply with an unequivocal denial, but rather he responded, "Not

as a DWI task force member, no." When asked if there was federal funding contingent on any number of arrests, again instead of an unequivocal denial, Officer Nathan replied,

A: Not for me, no.

Q: Or any part of the Lewisville Police Department?

A: I don't think we were participating in a DWI task force at the time.

The trial judge was obligated to determine whether Officer Nathan's supposition that he did not *think* Lewisville was participating in a task force *at that time* was substantiated by the documents in the State's control.

Furthermore, Cawley directly contradicted Officer Nathan's guess that Lewisville was not participating in the DWI task force on the date of Appellant's arrest. Cawley actually asked the chief of police or one of the arresting officers about the DWI task force. Although she did not recall the exact words, she testified:

Q. Okay. But, in any event, based on your conversation with the chief of police of the City of Lewisville or the officer who arrested Mr. Page, did they tell you—did one of them tell you or lead you to believe that there was in effect a DWI task force at the time that they arrested him?

A. I believe so, yes.

. . . .

Q. But the gist of it was that there was a task force that existed at the time of the arrest?

A. I believe it was a county task force that existed, not a city task force.

Q. And they were part of the task force, the City of Lewisville?

A. I believe that was the substance of our conversation.

Although Cawley was evasive and admitted she neither asked about grants, goals, or stated objectives, nor looked at any

---

1. Majority op. at 207 (citing Ransonette v. State, 550 S.W.2d 36 (Tex.Crim.App.1976)).

2. *Ransonette,* 550 S.W.2d at 40 (emphasis added) (citations omitted).

documents, she finally admitted there may have been goals of the task force. But she also took it upon herself to determine what information was and was not relevant to the case before us. She stated in response to whether she had even asked whether there was a quota for arrests, "No, sir, because I believed that what you requested was not relevant to this particular case, and my inquiry ended there."

The majority would allow lawyers and witnesses to assume the duties of the trial judge. I would hold that a defendant should not be required to rely on the State's determination of what constitutes *Brady*[3] material. That determination is the obligation of the trial judge. The majority holds that Appellant must rely on the representations of Officer Nathan that he was not a member of the task force and did not have a quota and that, therefore, the requested documents would not contain evidence that was either impeaching, exculpatory, or mitigating, nor would they contain information that would lead to the discovery of impeaching, exculpatory, or mitigating evidence.[4] In this case, the trial court, without first performing an in camera inspection, granted Lewisville's motion for protective order, thus prohibiting Appellant's access to documents he believed contained information that could be used to impeach Officer Nathan. Furthermore, the trial court refused to require the State to produce the documents even for the limited purpose of the appellate record.

The United States Supreme Court addressed a defendant's right to an in camera inspection in *Pennsylvania v. Ritchie*, stating,

> It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. . . . "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[5]

The Court noted that it was impossible to say whether any of the information Ritchie requested was relevant to his claim of innocence because neither the prosecution nor the defense had seen and the trial judge had not reviewed the requested file.[6]

The Commonwealth argued that Ritchie was not entitled to disclosure because he did not make a particularized showing of what information he was seeking or how it would be material.[7] In response the Court held that Ritchie could not require the trial court to search through the file without first establishing a basis for his claim that it contains material evidence: " 'He must at least make *some plausible showing* of how their testimony would have been both material and favorable to his defense.' "[8] The Court also held that Ritchie was entitled to know whether the file contained information that may have changed the outcome of his trial had it been disclosed and that an in camera review by the trial court would serve Rit-

3. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

4. For example, the State must inform a defendant of the existence of a witness who would provide testimony favorable to the defense. *See Flores v. State*, 940 S.W.2d 189, 191–92 (Tex.App.—San Antonio 1996, no pet.) (finding reversible error where accused did not know of existence of witness who provided exculpatory evidence to the State and where prosecution suppressed information it learned from this witness on day before trial).

5. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)).

6. *See id.*

7. *See id.* at 58 n. 15, 107 S.Ct. at 1002 n. 15.

8. *Id.* (emphasis added) (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982)).

chie's interest without destroying the Commonwealth's need to protect confidentiality.[9]

A defendant is not necessarily entitled to direct access to the requested information, but, "[n]evertheless, a defendant seeking merely an *in camera* inspection to determine whether certain files contain *Brady* material need only make a 'plausible showing' that the file will produce 'material' evidence."[10]

> When, as in *Ritchie* and in the instant case, an accused cannot possibly know, but may only suspect, that particular information exists which meets these requirements [both favorable to the accused and material to guilt or punishment], he is not required, in order to invoke the right, to make a particular showing of the exact information sought and how it is material and favorable. Instead, he need only at that stage "at least make some plausible showing" that it does exist and how it would be "both material and favorable to his defense." Upon making such a showing, the accused does not become entitled to direct access to the information to determine for himself its materiality and favorability. Rather, he does become entitled, in order to secure the basic right, to have the information he has sufficiently identified submitted to the trial court for *in camera* inspection and a properly reviewable judicial determination made whether any portions meet the "material" and "favorable" requirements for compulsory disclosure.[11]

Thus, federal case law is clear that once a defendant makes a plausible showing that the evidence exists and that it is both material and favorable, he is entitled to an in camera inspection to determine whether the information must be disclosed under *Brady*.

Turning to Texas case law, this situation is similar to the State's refusal to produce Crime Stoppers information. The court of criminal appeals held that a defendant seeking production of information protected by confidentiality provisions of the Crime Stoppers statute was entitled to production of the information for an in camera inspection by the trial court, to determine whether the information contains *Brady* material, in which case the evidence must be released to the defendant.[12]

Contrary to the statements of the majority, Officer Nathan's testimony was not uncontradicted. And, contrary to the position of the majority, a defendant in a criminal trial is not required to accept the State's determination of what evidence may be material and favorable.[13] The State does not bear the burden of guaranteeing a fair trial. That obligation rests squarely on the shoulders of the trial judge. It is a simple matter to abate the appeal and to order the trial court to conduct an in camera inspection of the documents in question and to seal the documents and make them part of the appellate record. In this case, the requested documents are not included in the appellate record because the trial judge refused to order their production. Not only do we have a duty to make sure material and favorable information is turned over to the defendant, we have a duty to allow the defendant to perfect the appellate record by providing the documents to a judge for

**9.** *See id.* at 61, 107 S.Ct. at 1003.

**10.** *United States v. Lowder,* 148 F.3d 548, 551 (5 th Cir.1998).

**11.** *Love v. Johnson,* 57 F.3d 1305, 1313 (4 th Cir.1995) (citations omitted).

**12.** *See Thomas v. State,* 837 S.W.2d 106, 113–14 (Tex.Crim.App.1992).

**13.** *See United States v. Kiszewski,* 877 F.2d 210, 215–16 (2d Cir.1989) (holding that it was error for district court to refuse to compel production of government agent's personnel file for in camera inspection based solely on representations of government that file contained no *Brady* material).

review, even when the trial judge refuses to inspect the documents.

The majority's conclusion directly contradicts our prior opinions,[14] and it is in direct conflict with federal and state law that requires in camera examination of documents in the State's control to determine whether *Brady* material exists. When balancing a defendant's due process rights against the slight inconvenience to the trial judge of a few minutes' examination of documents, the scales must weigh heavily in favor of one of the most basic of our constitutional guarantees.

A trial judge has an affirmative duty to do his best to provide both sides a fair trial. He upholds this duty to both the State and the defense by examining potential *Brady* material in camera with no one else present. In that way he protects the privacy interests of the State and safeguards the due process protections guaranteed to the defendant. Because the trial judge failed to perform this duty, I respectfully dissent to the majority's placing on Appellant the burden of proving to the trial court the existence of *Brady* evidence and its contents before triggering his right to an in camera inspection. I further dissent to the majority's determination of Officer Nathan's credibility and its misstatement in saying that his testimony was uncontroverted.

In summary, the test for triggering the requirement of an in camera inspection is a plausible showing that (1) the evidence exists and (2) how this evidence would be both material and favorable to the defense.[15] The defendant is entitled to direct access to the information only after the trial court makes a "properly reviewable judicial determination [as to] whether any

portions meet the 'material' and 'favorable' requirements for compulsory disclosure."[16]

The majority incorrectly applies the test for sufficiency of the evidence rather than the *Pennsylvania v. Ritchie* "plausible showing" standard for triggering an in camera inspection for *Brady* material. Although Cawley could be said to have contradicted Officer Nathan's testimony, the majority states that it will not second guess the trial court's implied finding that Officer Nathan's testimony was credible and upholds the trial court's decision as a determination based on credibility.

At this point, we do not determine whether the State withheld *Brady* material requiring reversal and remand for a new trial. We are only determining whether Appellant was entitled to an in camera inspection and whether the documents he believes were material and favorable to his defense should be made a part of the appellate record. We cannot determine whether Appellant was denied *Brady* material unless the documents at issue are part of the appellate record. The majority is not correct in requiring Appellant to make the more stringent showing of entitlement to a new trial because of *Brady* violations. The sole test for triggering the requirement of an in camera inspection is some plausible showing that (1) the evidence exists and (2) how this evidence would be both material and favorable to the defense.

Appellant made a plausible showing that documents regarding the DWI task force do exist. The State has never claimed that the requested documents do not exist. Rather, Lewisville, not the State, filed motions for protective order. At the hearing on these motions, Cawley argued that Lewisville should not be forced to turn

---

14. *See, e.g., Dixon v. State,* 923 S.W.2d 161, 167 (Tex.App.—Fort Worth) (holding that to balance competing interests of State and defendant, trial court must conduct in camera review of requested information to determine whether it contains any *Brady* material), *vacated on other grounds,* 928 S.W.2d 564 (Tex. Crim.App.1996).

15. *See Love,* 57 F.3d at 1313 (relying on *Ritchie,* 480 U.S. at 58 n. 15, 107 S.Ct. at 1002 n. 15).

16. *Id.*

over records concerning a DWI task force or quotas. Cawley testified that there was a DWI task force and that she believed Lewisville was participating in the task force at the time of Appellant's arrest. Cawley further stated,

> If the ' Court is asking me to relay whether or not my officers or my chief has led me to believe there was such a force in existence, then I would submit to the Court that it is my belief, based on conversation, that *there may be information responsive to the request.* [Emphasis added.]

Cawley, however, stated that she just did not believe these documents were relevant. Appellant clearly met the first prong of the test.

Appellant also made a plausible showing of how the requested documents would have been both material and favorable to his defense. All of the evidence of Appellant's intoxication regarding his driving and his admissions and conduct at the scene came exclusively from Officer Nathan. Officer Nathan denied he was a part of a county task force. He stated that he had no personal arrest quota and that he did not think Lewisville was participating in the task force at the time of Appellant's arrest. Task force documents that contradicted Officer Nathan's testimony would have constituted impeachment evidence and would have been crucial to a defense consisting of Officer Nathan's lack of credibility. There is a reasonable probability that, had evidence of a DWI task force been disclosed to the defense, Appellant could have impeached Officer Nathan and the result of the trial would have been different. The requested evidence therefore was both material and favorable to Appellant's defense. Appellant clearly met the second prong of the test.

Having made a plausible showing that the evidence existed and that it was both material and favorable to his defense, Appellant was absolutely entitled to an in camera inspection of the requested docu-ments. We should sustain Appellant's thirteenth point on appeal, abate the remainder of the appeal, and remand the case to the trial court for the trial court to conduct an in camera inspection of the DWI task force documents, to make findings of fact and conclusions of law, and to supplement the record with the task force documents, which should be sealed and not provided to Appellant except by agreement of the State.

For these reasons, I respectfully dissent.

RICHARDS, Justice, dissenting.

I respectfully dissent. I would abate this appeal and remand the case to the trial court for an in camera inspection of the State's files to determine whether *Brady*[1] material exists. Appellant made a specific request, supported by a plausible showing that such evidence exists. *Cf. Ransonette v. State,* 550 S.W.2d 36, 40 (Tex.Crim.App.1976).

LIVINGSTON, J. joins.

---

1. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).