**Clifton Earl CURTIS, Appellant**

v.

**The STATE of Texas, State.**

**No. 2–05–102–CR.**

Court of Appeals of Texas, Fort Worth.

Aug. 31, 2006.

Pete Gilfeather, Fort Worth, for Appellant.

Tim Curry, Criminal District Atty., Charles M. Mallin, Danielle A. LeGualt, Alan Levy and Bruce Fyfe, Assistant Criminal District Attys., Fort Worth, for Appellee.

Panel B: DAUPHINOT, HOLMAN, and GARDNER, JJ.

## OPINION

ANNE GARDNER, Justice.

### Introduction

Appellant Clifton Earl Curtis appeals from his conviction and life sentence for aggravated sexual assault—serious bodily injury. In seven points, Appellant asserts errors relating to voir dire, the exclusion and admission of certain evidence, and the trial court's refusal to charge the jury on a lesser included offense. We affirm.

### Background

Gloria King was strangled to death in her bed sometime on May 7, 1995. The

medical examiner collected vaginal and perianal swab samples during the autopsy of King's body. In 1997, police developed evidence allegedly implicating Appellant, who is King's nephew and who reported her body to police, as a suspect in the killing while investigating another homicide. Although Appellant denied that he ever had sexual intercourse with King, DNA from the autopsy swabs matched Appellant's DNA. Appellant was tried and convicted for capital murder in 2001. On appeal to this court, we reversed and remanded for a new trial, holding that the trial court erred by failing to charge the jury on the lesser included offenses of aggravated sexual assault and sexual assault. *See Curtis v. State*, 89 S.W.3d 163, 179 (Tex.App.-Fort Worth 2002, pet. ref'd).

On remand, Appellant was tried for aggravated sexual assault, and the trial court charged the jury on the lesser included offense of sexual assault. The jury convicted Appellant of aggravated sexual assault and sentenced him to life in prison, and the trial court rendered judgment accordingly.

## Challenges for Cause

■ In his first two points, Appellant argues that the trial court erred by overruling his challenges for cause to two venirepersons who stated that they had friends who were the victims of crimes. Venireperson McCoy, when asked whether her experience would affect her ability to assess punishment, answered, "Probably." Venireperson Shoquist said that his experience would cause him to lean towards the State.

■ A prospective juror who has a bias or prejudice against any phase of the law upon which a party is entitled to rely is properly challengeable for cause. *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim.App.2004). The test is whether the

bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Id.* Before a prospective juror can be excused for cause on this basis, however, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Id.* Great deference is given to the trial court's decision. *Id.*

In this case, Appellant's counsel did not explain the law to the veniremembers in question nor ask whether they could follow the law regardless of their personal views. We therefore defer to the trial court's discretion and overrule Appellant's first and second points.

## Exclusion of Crime Lab Evidence

■ In his third point, Appellant argues that the trial court erred by excluding the testimony of Treva Armstrong, a former Fort Worth Crime Lab employee, regarding problems at the crime lab when one of the State's DNA expert witnesses, Aliece Watts, worked there. The trial court excluded the evidence as irrelevant.

■ We review a trial court's ruling to admit or exclude evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g). If the court's decision falls outside the "zone of reasonable disagreement," it has abused its discretion. *Weatherred*, 15 S.W.3d at 542; *Montgomery*, 810 S.W.2d at 391.

Watts performed the relevant DNA analysis in 1998. Armstrong was not employed by the crime lab until 2000. Because Armstrong had no personal knowledge of any problems at the crime lab at the time of the DNA tests relevant to this case, we cannot say that the trial court

abused its discretion by excluding Armstrong's criticism of Watts's later work. We overrule Appellant's third point.

Appellant's fourth point also concerns Armstrong's testimony. Although the trial court excluded Armstrong's testimony about problems at the crime lab, Armstrong did testify about her criticisms of the methodologies employed by Watts in this case. On cross-examination, the State questioned Armstrong generally about various DNA-test methodologies. Appellant argues that the State "opened the door" to Armstrong's testimony about problems at the crime lab because some of those methodologies were associated with the problems at the crime lab when Armstrong worked there.

■ A witness opens the door to otherwise inadmissible evidence if, while testifying, the witness creates a false impression. *See Crenshaw v. State,* 125 S.W.3d 651, 656 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd). In such a case, opposing counsel may expose the falsehood. *See id.* (citing *Delk v. State,* 855 S.W.2d 700, 704 (Tex. Crim.App.), *cert. denied,* 510 U.S. 982, 114 S.Ct. 481, 126 L.Ed.2d 432 (1993)). We cannot see how the State's general questions about various DNA-test methodologies left the jury with a false impression of anything. Thus, we agree with the trial court when it said, "I don't think [the State] opened the door to anything," and we overrule Appellant's fourth point.

### YSTR DNA Testing

■ In his fifth point, Appellant argues that the trial court erred by admitting the results of a particular DNA test, the YSTR test, because the State failed to prove that the test was relevant and reliable. Specifically, Appellant argues that there was no evidence that YSTR test results have been admitted into evidence in a criminal trial anywhere in the United States and that

the evidence showed that the YSTR test is not standardized because different labs use different markers for the test.

■ Rule 702 of the Texas Rules of Evidence provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702. Under Rule 702, the proponent of scientific evidence must show, by clear and convincing proof, that the evidence he is proffering is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact issue. *Weatherred,* 15 S.W.3d at 542 (citing *Nenno v. State,* 970 S.W.2d 549, 560–61 (Tex.Crim.App.1998)). Factors that could affect a trial court's determination of reliability include, but are not limited to, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question. *Kelly v. State,* 824 S.W.2d 568, 573 (Tex.Crim.App.1992). Before novel scientific evidence may be admitted under rule 702, the proponent must persuade the trial court, by clear and convincing evidence, that the evidence is reliable and therefore relevant. *Id.* at 573.

The trial court conducted a *Kelly* hearing on the YSTR evidence outside the jury's presence. William Watson testified for the State. Watson is the forensic laboratory director for Orchid Cellmark, a DNA testing laboratory, and holds a Bachelor of Science degree in microbiology and a Master of Science degree in biology. Watson testified that YSTR employs the same technology as an older test—STR—but examines genetic markers on the Y-chromosome, found only in males. Building on research conducted by the National Institute of Standards and Technology, Orchid Cellmark developed a set of ten YSTR markers. The markers are located on regions of the DNA molecule that have been fully sequenced. Other labs in the United States and Europe have used the same YSTR markers since the mid–1990s. YSTR underwent validation studies prior to use in forensics, and those studies have been published in peer-review journals. Watson testified that there is a general consensus in the scientific community that YSTR testing is reliable, accurate, and valid. On cross-examination, Appellant established that different labs use different sets of YSTR markers, but there is substantial overlap among the different sets. The State also called Cassie Johnson at the *Kelly* hearing. Johnson is a forensic DNA analyst for Orchid Cellmark and holds a Bachelor of Science degree in biology and chemistry, a Master of Science degree in biomedical sciences, and a Master of Science degree in forensic genetics. Johnson was involved in optimizing the YSTR markers for Orchid Cellmark, and she performed the YSTR test on the DNA samples in this case.

At the conclusion of the *Kelly* hearing, the trial court found that the YSTR methodology had been validated "internally and externally" and subjected to peer review, that it was generally accepted in the scientific community, and that the YSTR evidence was reliable and relevant. In light of the testimony presented at the *Kelly* hearing, we hold that the trial court did not abuse its discretion by determining that the YSTR evidence was reliable and relevant, and we overrule Appellant's fifth point.

### Blood Sample Search Warrant

In his sixth point, Appellant argues that the trial court erred by allowing a police detective to testify that he collected a sample of Appellant's blood pursuant to a search warrant. Appellant argues that testimony about the search warrant was not relevant because he voluntarily submitted a blood sample and was prejudicial because it left the jury with the impression that he did not cooperate with police.

Nothing in the record, apart from the argument of Appellant's counsel to the trial court, suggests that Appellant voluntarily submitted a blood specimen for DNA testing. A major thrust of Appellant's theory of defense was that the State mishandled the DNA evidence in this case. Thus, the circumstances under which the State obtained DNA from Appellant was relevant to issues before the jury. We therefore hold that the trial court did not abuse its discretion by allowing the detective to testify about the search warrant, and we overrule Appellant's sixth point.

### Lesser Included Offense

In his seventh point, Appellant argues that the trial court erred by failing to charge the jury with the lesser included offense of aggravated assault.

To determine whether a jury must be charged on a lesser included offense, we apply a two-step analysis. *Salinas v. State*, 163 S.W.3d 734, 741 (Tex.Crim.App. 2005); *Moore v. State*, 969 S.W.2d 4, 8 (Tex.Crim.App.1998). The first step is to

decide whether the offense is a "lesser included offense" as defined in article 37.09 of the code of criminal procedure. TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon 1981); *Salinas,* 163 S.W.3d at 741; *Moore,* 969 S.W.2d at 8. "An offense is a lesser included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." TEX.CODE CRIM. PROC. ANN. art. 37.09(1). Here, the State concedes that aggravated assault can be a lesser included offense of aggravated sexual assault.

■■■■ Second, some evidence must exist in the record that would permit a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser offense. *Salinas,* 163 S.W.3d at 741; *Rousseau v. State,* 855 S.W.2d 666, 672–73 (Tex.Crim.App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Royster v. State,* 622 S.W.2d 442, 446 (Tex. Crim.App.1981). The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether the lesser included offense should be submitted. *See Gadsden v. State,* 915 S.W.2d 620, 622 (Tex.App.-El Paso 1996, no pet.). Regardless of its strength or weakness, if more than a scintilla of evidence raises the issue that the defendant was guilty only of the lesser offense, the charge must be given. *Bignall v. State,* 887 S.W.2d 21, 23 (Tex.Crim.App.1994); *Saunders v. State,* 840 S.W.2d 390, 391 (Tex.Crim.App.1992). In deciding whether a lesser included offense instruction is warranted, we are required to view the evidence in the light most favorable to Appellant and give him the benefit of reasonable inferences from the evidence, without regard to whether it is credible, controverted, or in conflict with other evidence. *Curtis,* 89 S.W.3d at 179.

■■■■ An accused is guilty only of a lesser included offense if there is evidence that affirmatively rebuts or negates an element of the greater offense or if the evidence is subject to different interpretations, one of which rebuts or negates the crucial element. *See Schweinle v. State,* 915 S.W.2d 17, 19 (Tex.Crim.App.1996); *Ramirez v. State,* 976 S.W.2d 219, 226–27 (Tex.App.-El Paso 1998, pet. ref'd). It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense. *See Skinner v. State,* 956 S.W.2d 532, 543 (Tex.Crim.App.1997), *cert. denied,* 523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). A charge on the lesser offense is not required if a defendant's evidence suggests that he committed no offense at all. *Lofton v. State,* 45 S.W.3d 649, 652 (Tex.Crim.App.2001) (citing *Bignall,* 887 S.W.2d at 23 (Tex.Crim.App.1994)).

A person commits the offense of aggravated sexual assault if the person causes the penetration of another's sexual organ without the other's consent and causes serious bodily injury to the victim in the course of the same criminal episode. TEX. PENAL CODE ANN. § 22.021 (Vernon 2004). A person commits the offense of aggravated assault if the person intentionally, knowingly, or recklessly causes serious bodily injury to another. *Id.* §§ 22.01, 22.02 (Vernon 2004).

Appellant argues that he was entitled to a charge on aggravated assault because the medical examiner testified on cross-examination as follows:

Q: [W]hen you find semen in the vagina of the deceased, can you determine when it got there in relation to when the person died?

A: No.

Q. Up to how many days prior to the death could it be?

A. There have been reported examples of even identifiable viable moving sperm

recovered from the woman's vagina as much as three or four days after intercourse.

Appellant contends that this testimony raises the possibility that Appellant had sexual intercourse with King days before she was murdered; thus, the penetration of her sexual organ may not have occurred "in the same criminal transaction" as the serious bodily injury that resulted in her death. *See* TEX. PENAL CODE ANN. § 22.021.

We agree that the testimony in question raised the possibility of a temporal separation between the time Appellant had sex with King and the time of her death, but we disagree that this possibility entitled him to a charge on the lesser included of aggravated assault. The DNA evidence that Appellant had sexual intercourse with King—despite his repeated statements that he had never done so—was the same evidence and virtually the only evidence that pointed to Appellant as King's killer. The fact of King's death by strangulation was the key evidence tending to prove that Appellant sexually assaulted her, as opposed to engaging in consensual intercourse with her. If Appellant engaged in sexual intercourse with King days before death rather than at the time of her death, then the only reasonable and logical conclusion to be drawn from the evidence is that he neither sexually assaulted her nor killed her. It is the combination of Appellant's DNA on King's body and the circumstances of King's death that points to aggravated sexual assault as the crime and to Appellant as the perpetrator. Thus, if the medical examiner's testimony suggests that Appellant could have had sexual intercourse with King as many as four days before her death, then it suggests that he committed no crime at all. We therefore hold that the trial court did not err by denying Appellant's request for a charge

on aggravated assault, and we overrule his seventh point.

## Conclusion

Having overruled all seven of Appellant's points, we affirm the trial court's judgment.

DAUPHINOT, J. filed a dissenting opinion.

LEE ANN DAUPHINOT, Justice dissenting.

I must respectfully dissent from the majority's disposition of Appellant's third and fourth points because the majority appears to misconstrue Appellant's purpose for offering the evidence that the trial court excluded.

As the majority concedes,

The DNA evidence that Appellant had sexual intercourse with King [the complainant] . . . was the same evidence and virtually the only evidence that pointed to Appellant as King's killer. The fact of King's death by strangulation was the key evidence tending to prove that Appellant sexually assaulted her, as opposed to engaging in consensual intercourse with her. If Appellant engaged in sexual intercourse with King days before death rather than at the time of her death, then the only reasonable and logical conclusion to be drawn from the evidence is that he neither sexually assaulted her nor killed her. It is the combination of Appellant's DNA on King's body and the circumstances of King's death that points to aggravated sexual assault as the crime and to Appellant as the perpetrator. Thus, if the medical examiner's testimony suggests that Appellant could have had sexual intercourse with King as many as four days before her death, then it suggests that he committed no crime at all.[1]

The State offered Aliece Watts as both a fact witness and an expert witness to lay the predicate for admissibility of the DNA evidence. Watts had packaged and tested the DNA samples that connected Appellant to the case now before this court. Watts testified that Appellant alone donated the only DNA present in the vaginal and perineal swabs from the complainant. Yet Charles Moody admitted that he had sexual intercourse with the complainant on the night that she was killed and that he had ejaculated. Nothing other than Watts's testimony about the DNA tied Appellant to the sexual assault of the complainant.

The deputy medical examiner, Marc Krouse, testified that the complainant had been dead at least sixteen to eighteen hours at the time his office examined her, but that he could not determine when, in relation to her death, the semen, which Watts linked only to Appellant, had been deposited. Krouse testified that the semen could have been as much as four days old at the time of his examination.

The proponent of the scientific evidence bears the burden of demonstrating by clear and convincing evidence that the evidence is reliable.[2] "This is accomplished by showing: (1) the validity of the underlying scientific theory; (2) the validity of the technique applying the theory; and (3) proper application of the technique on the occasion in question."[3]

Watts discussed the development of DNA testing in general, the history of DNA testing in the Fort Worth Police Crime Lab, and the procedure that she claimed to have followed generally and specifically as related to the case now before this court. Appellant objected that Watts had not been qualified as an expert in this field. The trial court overruled the objection and granted Appellant's request for a running objection to all such testimony by Watts.

The defense also attempted to inform the jury of ongoing problems with mislabeling and mishandling of evidence through the testimony of Treva Armstrong, who had worked in the crime lab, although she was not there at the time Watts performed the specific tests regarding Appellant. Armstrong was qualified as an expert and prepared to testify to persistent problems with the lab equipment and to recurring problems in procedure and methodology that compromised the validity of the testing done in the lab and the integrity of the samples that were received and stored.

Armstrong was also prepared to testify about the contents of an affidavit regarding her concerns with Watts and the crime lab that she had prepared in 2002 in response to the chief of police's request. The affidavit's contents stated her concern about the large number of cases that were uncompleted at the time. It stated that Watts was working on nine to eleven cases simultaneously. Armstrong stated that Watts had only completed two of these and that

[o]ne of the two cases had to be completely repeated due to lack of good judgment and/or poor quality.... The other case had to be taken outside of the lab to an independent DNA expert because [Watts and another employee] could not come to an agreement as to the results of [Watts's] testing.

1. Majority op. at 663.

2. *Jackson v. State,* 17 S.W.3d 664, 670 (Tex. Crim.App.2000).

3. *Id.* (citation omitted).

"The other remaining DNA cases that Mrs. Watts started back in 2001 have either pled and/or been reworked." The affidavit stated that Watts consistently gave false impressions to defendants and/or their attorneys about how far along their testing process was.

Jaime King testified that she had worked with Watts in the Fort Worth Crime Lab and that sometime during the period of October 1995 to January 1996, King had performed DNA testing on the vaginal swab and the perineal swab of Gloria King using the RFLP method. Because "there was a lot of degradation, it wasn't a very good quality sample," so King obtained no results from testing those two items. Watts performed another kind of DNA testing on the Gloria King swabs in 1995, 1996, and 1998 and still obtained no results. Watts also admitted to errors in recording dates, procedures, and results of testing. Watts also testified that she was working on several cases at the same time. Finally, in October 1998, the Fort Worth Crime Lab turned over the testing in this case to GeneScreen.

The problems of quality control in the lab were so serious that both the district attorney's office and the police conducted an investigation of the lab.

The defense attempted to challenge the reliability of Watts's announced testing results by showing, through Armstrong's testimony, that the lab equipment was faulty, that contamination of samples was a pervasive problem, that Watts often did not follow proper protocol, that Watts often made mistakes in procedure, that she consistently misled defendants and/or their attorneys about the status of the testing process, that she had too many uncompleted cases and worked on too many cases at the same time, and that her work often had to be reworked or sent to an outside lab. The defense also attempted to use Armstrong's testimony to show Watts's bias in reporting results that would benefit the prosecution.

Clearly, the credibility of an expert witness is a material issue,[4] whether the credibility is challenged by showing a history of misleading statements that benefited one side to the detriment of the other, a failure to follow proper protocol, carelessness in performing testing and/or reporting of results, or a history of errors resulting in compromised results.

The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him.[5] The right of confrontation encompasses more than the opportunity to physically confront the witnesses.[6] A primary interest secured by the Confrontation Clause is the right of cross-examination.[7]

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.[8] The cross-examiner not only is permitted to delve into the witness's story to test the witness's perceptions and memory, but also is traditionally allowed to

---

4. Cf. *Ex parte Shepperd*, 513 S.W.2d 813, 816 (Tex.1974) (in condemnation case, holding that other appraisals of similar property are discoverable because they are material to the issue of the appraiser's credibility).

5. U.S. CONST. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 1359, 158 L.Ed.2d 177 (2004); *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Rankin v. State*, 41 S.W.3d 335, 344 (Tex.App.-Fort Worth 2001, pet. ref'd).

6. *Davis*, 415 U.S. at 315, 94 S.Ct. at 1110.

7. *Id.*

8. *Id.* at 316, 94 S.Ct. at 1110.

impeach, that is, discredit, the witness.[9] Consequently, the right to cross-examine a testifying State's witness extends to any matter that could reflect on the witness's credibility.[10] This right therefore includes impeaching the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or impairment or disability affecting the witness's credibility.[11] The trial judge should allow the accused great latitude to show any relevant fact that might tend to affect the witness's credibility.[12]

Appellant should have been allowed to impeach the reliability of Watts's work, the likelihood of contamination of samples, and the reliability of the quality of the samples she provided GeneScreen through the affidavit and through Armstrong's testimony. Just as an expert's appraisal reports for comparable properties prepared for prior condemnation proceedings were relevant and discoverable to show his bias in a subsequent appraisal,[13] Watts's pattern of errors and improper protocols in other cases were relevant and admissible to impeach her credibility as a fact witness and an expert witness. Because the majority does not so hold, I must respectfully dissent.

---

9. *Id.*

10. *Virts v. State,* 739 S.W.2d 25, 28–29 (Tex. Crim.App.1987).

11. *Id.* at 29; *Rankin,* 41 S.W.3d at 345; *Alexander v. State,* 949 S.W.2d 772, 774–75 (Tex. App.-Dallas 1997, pet. ref'd).

12. *Virts,* 739 S.W.2d at 29; *Koehler v. State,* 679 S.W.2d 6, 9 (Tex.Crim.App.1984).

13. *Shepperd,* 513 S.W.2d at 816.