

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00195-CV

———————————————————

IN THE MATTER OF C.F.

---

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-117087-21

---

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellant C.F. (Calvin)[1] was sixteen years old when, on or about July 23, 2021, he—along with J.F. (Jeffrey), a juvenile co-defendant—allegedly committed five felony offenses related to the shooting deaths of thirteen-year-old J.W. (James) and James's seventeen-year-old brother K.W. (Kevin). *See* Tex. Penal Code Ann. § 19.02(b)(1) (murder), (b)(3) (felony murder), § 19.03 (capital murder). After a hearing, the juvenile court waived its original jurisdiction and transferred Calvin's case to criminal district court.[2]

A juvenile court abuses its discretion when its transfer decision is arbitrary in light of the evidence upon which it was based. *In re A.K.*, No. 02-20-00410-CV, 2021 WL 1803774, at \*18 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.). By contrast, a transfer decision representing "a reasonably principled application of the legislative criteria" generally will pass muster under this standard of review. *Id.* In a single issue in this accelerated appeal, *see* Tex. Fam. Code Ann. § 56.01(h), Calvin argues that the juvenile court abused its discretion. Because the record reflects no abuse of discretion, we affirm the juvenile court's order.

---

[1]We use pseudonyms to protect the identity of juveniles. *See* Tex. R. App. P. 9.8.

[2]The certification hearing involved both Calvin and Jeffrey. The juvenile court opted not to waive its jurisdiction over Jeffrey.

## II.  THE JUVENILE COURT DID NOT ABUSE ITS DISCRETION.

Family Code Section 54.02(a) allows a juvenile court to waive its exclusive original jurisdiction and conduct a transfer if (1) the child is alleged to have committed a felony offense, (2) the alleged offense was—among other things—a capital or first-degree felony and the child was fourteen or older when he committed it, and (3) after a full investigation and a hearing, the court determines that there is probable cause to believe that the child committed the alleged offense and that because of the offense's seriousness or the child's background, the community's welfare requires criminal proceedings.  Tex. Fam. Code Ann. § 54.02(a).

To facilitate the Section-54.02(a) determination, the juvenile court "shall consider, among other matters" the four factors set out in Section 54.02(f).  *See Ex parte Thomas*, 623 S.W.3d 370, 378 (Tex. Crim. App. 2021) (quoting Tex. Fam. Code Ann. § 54.02(f)).  These factors are (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (2) the child's sophistication and maturity; (3) the child's record and previous history; and (4) the prospects of adequate protection of the public and the likelihood of the child's rehabilitation through procedures, services, and facilities currently available to the juvenile court.  Tex. Fam. Code Ann. § 54.02(f)(1)–(4).  Section 54.02(f)'s factors, which are nonexclusive, facilitate the juvenile court's balancing of the potential danger to the public posed by the juvenile offender with his "amenability to treatment," and any combination of these criteria may suffice to support a waiver

of jurisdiction and transfer. *A.K.*, 2021 WL 1803774, at *19. The State has the burden to persuade the juvenile court to transfer the case by a preponderance of the evidence. *Id.*

We must consider the evidence under the traditional sufficiency-of-the-evidence standard and then determine whether the court acted without reference to guiding rules and principles. *Id.* at *18. No abuse of discretion occurs when the juvenile court bases its decisions on conflicting evidence so long as some substantive and probative evidence supports its decision. *See In re J.H.L.*, No. 02-22-00037-CV, 2022 WL 3273593, at *3 (Tex. App.—Fort Worth Aug. 11, 2022, no pet. h.) (mem. op.).

## A. THE OVERLAPPING EVIDENCE OF THE SECTION 54.02(F) FACTORS IS SUFFICIENT.

The certification hearing began on April 29, 2022. Calvin stipulated to his name, date of birth, age, and the date of the offenses. Arlington Police Detective Julia Hall, the murder case's lead detective, Robert Lewis, Calvin's probation officer, and Victor, Calvin's father,[3] testified, and the juvenile court admitted into evidence Calvin's probation records—866 pages kept by Tarrant County Juvenile Services[4]—

---

[3]Calvin's mother was unable to attend the hearing.

[4]The probation records also contained police reports from the July 23, 2021 shootings.

and his pre-diagnostic report, which contained additional statements by witnesses and his co-defendant Jeffrey.

### 1. Ample Evidence Supports Probable Cause on the Murder Charges.

The evidence showed that on Friday, July 23, 2021, at 1:27 p.m., Arlington police officers were dispatched in response to reports of multiple gunshots near an apartment complex. James had been shot once in the chest, with a front entry wound and an exit wound in his back. Kevin had been shot four times, with entry wounds in his neck, chest, and back. Not long after arriving on the scene, officers stopped a vehicle attempting to exit the apartment complex at a high rate of speed—Jeffrey's mother was driving, and Jeffrey, her passenger, had a gunshot wound in his shoulder. Jeffrey was transported to the hospital for treatment, and the police obtained a search warrant for his residence and his mother's vehicle.

Witness statements, surveillance footage, and items collected under the search warrant tied Calvin, Jeffrey, and T.N. (Timmy)[5] to the offenses. During the search of Jeffrey's residence, police found a black sweatshirt with a green design[6] on the front, which a witness had described and which contained a hole matching Jeffrey's injury. They also found a black-and-silver 9-mm Ruger—a semiautomatic firearm—and two

---

[5]Timmy did not participate in the certification hearing, and it is unclear from the record whether he was charged with any offenses.

[6]The witness described it as "a green skull or apple." A photograph of the black sweatshirt shows that it is a green teddy bear wearing tattoos, a scowl, a gold watch and chain, and an earring and clutching dollars in one of its paws.

firearm magazines inside a gray backpack. The sweatshirt that Calvin had been wearing was also inside Jeffrey's residence, but it was not collected at that time; Jeffrey's father delivered it to the police two or three weeks later. The evidence connected Jeffrey to the nickname "8 ball" and Calvin to the nickname "Chucky."[7]

Jeffrey told the police that after he argued with James and Kevin, he called Calvin and Timmy and told them to bring firearms. They met together at a nearby strip mall just before the shooting. Jeffrey told the police that he had wanted to fight James and Kevin, but he alleged that "Chucky" (i.e., Calvin) had been the shooter. He also told them that Chucky had accidentally shot him because he had been standing between Chucky and the victims and that Chucky had continued firing after hitting him because James had reached for Kevin's gun. Kevin's gun was found deep within his undershorts, and Detective Hall opined that based on the gun's location, it seemed highly improbable that Kevin had the gun out at the time of the shooting.[8]

A different witness told the police that she saw three suspects fleeing the scene and that they had dropped something before they jumped over the fence. Police found a black Ruger semiautomatic firearm on the ground near the fence. Jeffrey's DNA was on this weapon.

---

[7]Before replacing his Instagram profile picture with a photograph of himself, Calvin had used an image of the doll "Chucky" from a horror movie.

[8]One of the officers' narratives indicated that a paramedic had found the gun—a SCCY 9-mm semi-automatic pistol with a 30-round magazine loaded with live 9-mm Full Metal Jacket rounds—inside Kevin's waistband.

Regarding the black-and-silver handgun found in the backpack at Jeffrey's residence, a DPS crime lab matched ballistics to it. DNA on the black-and-silver handgun showed a mixture of male DNA, and after Y-STR testing,[9] Jeffrey, Timmy, and the victims were completely excluded as possible contributors. The lab "could not make any conclusions as to whether or not [Calvin] was a possible contributor."

The police obtained thirty pages of Calvin's text messages, photos, and screenshots, which were admitted into evidence, and Detective Hall summarized the content of messages between Calvin and Jeffrey's sister as follows:

> [Jeffrey's] sister is basically confronting [Calvin] about being . . . with [Jeffrey] during the initial offense, and he does admit to her . . . he was there. He saw [Jeffrey] and the victims arguing. She asked him, like, who had the gun in the backpack and then goes on to say that your jacket—or what she was referring to the sweatshirt was in the backpack, and he . . . responds by saying, I left it on the porch, and she says, well, I pulled your jacket out and the gun fell out, and then he was saying, everyone is going to think I did it and it's going to have my DNA on it because his sweatshirt was in the bag with it. He is alleging to [Jeffrey's] sister that him and [Timmy] . . . had gone . . . all the way to Parkland Pointe to take their sweatshirts off and then walked back to Artisan in order to fight. He said that [Jeffrey] had only wanted to fight, but that the victim had pulled out a gun.

Calvin told Jeffrey's sister that Jeffrey was the shooter, but Detective Hall opined that the evidence did not support that conclusion. Calvin told another text-message

---

[9]Y-STR testing examines genetic markers on the Y-chromosome, which is found only in males. *See Curtis v. State*, 205 S.W.3d 656, 661 (Tex. App.—Fort Worth 2006, pet. ref'd) (describing Y-STR testing); Nicole L. Phillips & Stephen Smith, *Reinterpreting the Ethical Duties of A Prosecutor: Y-Str As A Model Investigatory Tool*, 22 Geo. J. Legal Ethics 1073, 1076 (2009) (explaining advantages and drawbacks associated with Y-STR testing).

correspondent that he had been at the scene with Timmy and that they ran when they heard the shooting, explaining, "we was posed to link and smoke . . . but don't tell nobody ion want my name dragged in sh-t," and denying having shot anyone that day. He told someone else by text, "I was with 8 ball to make sure they just fought n das it."

## 2. Sufficient Evidence Supports Calvin's Record and Previous History.

Calvin was taken into detention for the murders on July 29, 2021, and subsequently received a referral for another felony offense—aggravated robbery—that he was alleged to have committed on July 12, 2021. The aggravated-robbery victim was a pizza delivery driver, and the assailant—described as a black male in a dark hoodie and gray mask and later identified as Calvin—pointed a Glock-style handgun at the driver and demanded his car keys. When Calvin was unable to start the vehicle, he engaged in a physical altercation with the victim and then fled the scene.

Calvin was also involved in an assault-bodily injury case at the detention center on September 25, 2021. The victim, another detention-center resident, suffered a cut and a swollen lip after being assaulted by another resident with Calvin's alleged assistance.

Detention involved a daily behavior assessment from Level 1 (best behavior) to Level 3 (worst behavior). On October 25, 2021, detention-center staff reported to Lewis, Calvin's probation officer, that Calvin had physically assaulted another resident

8

after a brief exchange of words about their placement in line; Calvin received a safety-based seclusion and the other resident received a disciplinary seclusion.[10] On March 8, 2022, Calvin received a Level 3C assessment because he had attempted to punch a detention staff member.

From July 29, 2021 to April 17, 2022, Calvin lost behavior points for talking out of turn, talking too much, or talking to the wrong person. He also lost points for horseplay, for moving around without permission, for not being on task, for farting, for being disruptive, for throwing gang signs, and for making derogatory and threatening comments to other residents.

### 3. Conflicting Evidence Exists of Calvin's Sophistication and Maturity.

Calvin had lived in Louisiana with his mother, who sent him to Texas a couple of months before the charged offenses to live with his father, Victor. She sent Calvin to Texas to live with his father to keep Calvin out of trouble. According to Victor, Calvin's personality had changed after one of Calvin's younger brothers died in an 18-wheeler wreck in 2018. He became isolated, anxious, and depressed, and there were other changes, such as his "[a]ttitude, just staying out later, being with different people, not in the house anymore." His grades dropped "all the way down" and he started failing some classes. Victor did not approve of the new kids with whom

---

[10]Lewis explained that seclusion "is when the resident of the detention center is removed from the population of the detention center and placed in their room for a period of time."

9

Calvin had been associating, and he described Calvin in the period of time after the 2018 accident as immature and "not acting his age." Calvin had been diagnosed with ADHD but had elected to stop taking his medication to treat it even though he performed better academically when medicated.

Three weeks before the shooting, Calvin had started his first job, a part-time position at McDonald's. Victor had filled out the job application for him. Before the shooting, Victor had been a long-distance truck driver, and his sister, who lived with him, kept an eye on Calvin when Victor was away. Victor had not known that Calvin had been smoking marijuana or carrying guns. They had not talked about the aggravated robbery involving the pizza delivery person because Victor had not known about it.

Lewis testified that Calvin had received "more than a few" seclusion reports—twenty-two separate ones—for things like fighting, being disrespectful, and refusing to participate. However, on cross-examination, Lewis agreed that a safety-based seclusion was not disciplinary and that a number of Calvin's seclusions were safety-based; eleven were resident-initiated separations, meaning that Calvin had chosen to remove himself.

Lewis agreed that, as stated in the pre-diagnostic report, Calvin's IQ score of 40[11] was significantly below average and that his grade-equivalent levels were between

_____

[11]"IQ" or "intelligence quotient" testing is "a significant factor in making both the legal and clinical assessment of intelligence or intellectual functioning." Robert M.

10

first and third grade with a borderline range of adaptive behavior functioning, which went to Calvin's ability to conform his behavior to norms.

Dr. Monica Jeter, the licensed psychologist who conducted Calvin's assessment, stated in her report that Calvin did not have an intellectual disability or a significant mental illness, that he was not more sophisticated or mature than his same-aged peers, and that he would likely benefit from juvenile-justice services. She also stated that it "appear[ed] the community would be at a moderate level of risk were [Calvin] to remain in it," that the intellectual testing results "appear to be an underestimate of [Calvin's] current intellectual and academic functioning," and that his test-taking approach "reflected that he may not have been fully attentive and/or cooperative when completing the test form." Specifically, while evaluated, Calvin was "fidgety, distractible[,] and displayed poor motivation."

---

Sanger, *IQ, Intelligence Tests, "Ethnic Adjustments" and Atkins*, 65 Am. U.L. Rev. 87, 101 (2015) (discussing IQ in the death-penalty context). For comparative purposes, an IQ of 100 "is the average IQ score of youths nationwide, ranging mostly from 85 to 115." Thomas Grisso, Ph.D., *Adolescents' Decision Making: A Developmental Perspective on Constitutional Provisions in Delinquency Cases*, 32 New Eng. J. on Crim. & Civ. Confinement 3, 9 (2006); *see In re A.G.*, No. 02-21-00297-CV, 2022 WL 488924, at *1 & n.2 (Tex. App.—Fort Worth Feb. 17, 2022, pet. denied) (mem. op.) (noting juvenile parent had a full-scale IQ of between 43 and 53). Calvin's pre-diagnostic study referred to a "composite intelligence score of 40 on the Reynolds Intellectual Assessment Scales." The Reynolds Intellectual Assessment System is an intelligence test similar to an IQ test. *See Griffin v. State*, 491 S.W.3d 771, 786, 790 (Tex. Crim. App. 2016) (Yeary, J., dissenting) (noting that "[s]ignificantly subaverage intellectual functioning is generally characterized by a full-scale IQ score of about 70 or below").

### 4. Scant Evidence Exists of Rehabilitation and Available Services

Victor opined that Calvin could benefit from counseling, therapy, anger management, tutoring, and job training, but he did not testify about whether Calvin had received any of these services before the shootings.

Lewis acknowledged that Calvin had not received juvenile-department services before his detention, and he was unaware of any juvenile-justice history before Calvin's move to Texas. He agreed that Calvin appeared to have a hard time managing his anger but had not been offered anger management treatment because the detention center had no therapeutic programming. Lewis also agreed that in light of his brother's death, Calvin would benefit from grief counseling.[12] No one testified about the procedures, services, and facilities available to the juvenile court, but Calvin's probation records contained his report card for the final six-week period of the 2020–2021 term, which reflected multiple absences, tardies, and failing grades. It also contained his student discipline report, which reflected insubordination, skipping-class, and dress-code violations, as well as in-school and out-of-school suspensions.

### B.  THE JUVENILE COURT'S OBSERVATIONS SUPPORT ITS ORDER.

At the hearing's conclusion, the juvenile court took notice of its file, as well as "all the competent evidence provided at th[e] hearing," including Calvin's complete pre-diagnostic study and social evaluation. The juvenile court stated that it considered

---

[12]Not long after Calvin went into detention, one of his close friends committed suicide.

whether the offense was against persons or property, Calvin's sophistication and maturity, his record and previous history, and the public's protection and likelihood of his rehabilitation. And it found that Calvin was at least 15 years old at the time of the capital and first-degree offenses, that he had not yet been subject to an adjudication hearing, and that there was probable cause to support charging him with the offenses.

The juvenile court specifically observed that Calvin had demonstrated sophistication through his actions and that the odds of rehabilitating him through the juvenile-justice system were low, stating,

> [T]he evidence presented before the Court today shows a high level of sophistication both the planning, as you are the person who it appears brought the gun and appears that you're the one that shot the gun, and it appears to have had all the steps to avoid culpability in this offense. In your case, sir, given your background, your history and your behavior in our detention facility gives me no hesitation in deciding that we -- the juvenile justice system cannot rehabilitate you. At that point since there will be no . . . rehabilitative [e]ffect on you, sir, I'm not sure why the juvenile justice system needs to retain your case. So I am waiving my jurisdiction over your matter and will refer this case to adult criminal court for future prosecution.
>
> . . . .
>
> [Calvin], as much as I would like to see the possibility of rehabilitation, given your behavior, especially since you were brought here into Kimbo, it tells me there's just nothing we can do for you, and it's that it's not my desire. I wish there was. I just don't see it. So I'm comfortable waiving my jurisdiction.
>
> . . . .
>
> Finally, the law requires me that I must tell you the reason for my transfer. Specifically, my reason is I do not believe the juvenile justice system can assist you in rehabilitation, all right, and that's what it's based

13

on.  That's the difference between you and [Jeffrey].  [Jeffrey], maybe, I don't know.  With you, I'm pretty certain we just can't do anything for you.

In its order, the juvenile court found that Calvin had been charged with a capital felony and four first-degree felonies, that there was probable cause to believe that Calvin had committed the offenses, and that Calvin was of sufficient sophistication and maturity to be tried as an adult.  The juvenile court also found that the likelihood of Calvin's reasonable rehabilitation by the use of procedures, services, and facilities currently available to the juvenile court was low and that "after considering all of the testimony, exhibits, diagnostic study, social evaluation, and full investigation, . . . it is contrary to the best interests of the public to retain jurisdiction." Because of the circumstances and seriousness of the alleged offenses, as well as Calvin's role before, during, and after the offenses, the juvenile court determined that the welfare of the community required criminal proceedings.

In the order, the juvenile court stated that it had considered the Family Code Section 54.02(f) factors and based its findings on the contents of the pre-diagnostic study; the testimonies of Lewis and Detective Hall and the evidence admitted through them; "on the heinous nature of" the offenses and the manner in which Calvin had allegedly committed them; Calvin's role in planning, setting up, and executing the offenses; his actions during and after the offenses; and the evidence that Calvin would not benefit from services afforded through the juvenile-justice system.

## C. CALVIN'S ARGUMENT RELIES ON CONFLICTING EVIDENCE.

In his single issue, Calvin observes that the State met its burden of proof that probable cause existed to issue an arrest warrant for him. He nonetheless argues that the evidence "clearly established that the juvenile court should have retained jurisdiction because there were sufficient safeguards in place for the public and a high probability of rehabilitation for [Calvin] by use of procedures, services, and facilities currently available to the juvenile court." He further argues that he should not have been transferred to adult criminal court because of his significantly below-average IQ, his low grade-level equivalent, his borderline adaptive behavior functioning score, and Dr. Jeter's psychological evaluation, in which she opined that he would likely benefit from juvenile-justice services.

The State responds by pointing out that in Calvin's psychological evaluation, Dr. Jeter also stated that he was not intellectually disabled or significantly mentally ill and that "[i]t appears that the community would be at a moderate level of risk were he to remain in it." The State further points out that the juvenile court was the sole judge of the witnesses' credibility and the weight to be given their testimony and that the seriousness of the charged offenses alone support the waiver and transfer order. *See In re D.T.*, No. 02-20-00312-CV, 2021 WL 5028769, at *13 n.16 (Tex. App.—Fort Worth Oct. 28, 2021, no pet.) (mem. op., not designated for publication) ("As the factfinder, the juvenile court was the sole judge of the witnesses' credibility and the weight to be given their testimony.").

Based on the evidence set out above and the juvenile court's role as factfinder, *see id.*, we cannot say that the juvenile court abused its discretion, *see A.K.*, 2021 WL 1803774, at *18. As conceded by Calvin, there was sufficient evidence to support a finding that he had committed a capital or first-degree felony. *See* Tex. Fam. Code Ann. § 54.02(a). Further, the offenses resulted in the death of two people, for which greater weight in favor of transfer is given. *See id.* § 54.02(f). And in light of the aggravated-robbery offense that he allegedly committed just weeks before the murders, the record of his behavior while in detention, and the school records contained within the probation file that showed his earlier disciplinary issues, the juvenile court could also have reasonably concluded that the community's welfare and protection required the transfer. *See id.* § 54.02(a), (f).

Furthermore, the evidence of Calvin's sophistication and maturity was subject to interpretation by the juvenile court. Although the evidence reflected Calvin's low intelligence and lack of mental health treatment before and after the offenses, it also showed Calvin's efforts to try to shift blame from himself and to avoid the consequences of his actions, and the juvenile court had the discretion to determine—based on this information—whether Calvin could be safely rehabilitated while adequately protecting the public. Because any combination of the Section 54.02(f) factors may suffice to support a waiver of jurisdiction and transfer, *see A.K.*, 2021 WL 1803774, at *18, the juvenile court did not abuse its discretion. Accordingly, we overrule Calvin's sole issue and affirm the juvenile court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Delivered:  September 29, 2022