In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00094-CR

                                                ______________________________

 

 

                                          LATOYA SMITH,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                      On Appeal from the 202nd
Judicial District Court

                                                             Bowie County, Texas

                                                       Trial Court
No. 07F0378-202

 

                                                    
                                              

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                    Opinion by Chief Justice Morriss








                                                                   O P I N I O N

 

            The
physical abuse suffered by the victim in this case over a period of days was
reminiscent of torture reportedly used by rogue captors to break military
prisoners.  Two attackers repeatedly
assaulted the much smaller and weaker victim, sometimes kicking her, sometimes
slamming her into the wall, sometimes striking her with belts.  They made her stand barefooted and motionless
for hours at a time, sometimes atop an overturned plastic milk crate cast using
a large open grid pattern, which caused her additional pain.  When she faltered, she was further assaulted.  As if the victim had not suffered enough, on
the final day of the attacks, her female attacker repeatedly pushed the
exhausted victim backward onto the floor. 
Each fall caused the victim’s head to hit the floor; the last time hard
enough so a witness heard the victim’s “brain crack.”  The victim, River Phoenix Williams, died from
her injuries.

            River
Phoenix was two years old.  The attackers
were her father and the father’s live-in girlfriend.

            Just as
River Phoenix had been entitled to the protections of the law, her attackers,
too, are entitled to all applicable protective provisions of the law.

            Latoya
Smith, the live-in girlfriend, was convicted in River Phoenix’s death, after
River Phoenix’s father, Neil Patrick Dewitt, had pled guilty to the same crime.

            Sentenced to
life imprisonment without parole, Smith appeals, urging a number of arguments
but making no challenge to the sufficiency of the evidence to prove the offense
of capital murder.  We affirm the trial
court’s judgment because (1) the State’s nondisclosure of certain evidence did not
require an in camera inspection of the State’s file or a mistrial, (2) no
Confrontation Clause violation arose from the trial court’s rulings regarding
the testimony of Wade and Roberson, (3) admitting River Phoenix’s autopsy
report did not violate the Confrontation Clause, (4) excluding evidence of
Smith’s mental health history during the guilt/innocence phase was not error,
and (5) admitting evidence of Smith’s prior behavior and attitude toward River
Phoenix was not error.  We address the
arguments in that order, after recounting the facts in greater detail.

            Before her
death, River Phoenix lived with Dewitt, Smith, and River Phoenix’s minor sister,
K.T.  Dewitt admitted that he was party
to the abuse that caused his child’s death, pled guilty to capital murder, and
also received a sentence of life imprisonment without parole.  He testified against Smith during her trial,
consistently said that the two of them killed River Phoenix, and enlightened
the jury on the origins of Smith’s jealousy, dislike, and abuse of River
Phoenix, who was Dewitt’s daughter by another woman.  Dewitt stated, “When I found out that [River
Phoenix] was my child, [Smith] had said, well, there’s your child you could’ve
had with me.”  Dewitt also testified that
Smith would never accept River Phoenix, and felt that Dewitt “cheated on her
because [River Phoenix] came in after we were together.”  Smith’s journal complained that Dewitt told
River Phoenix that Smith was picking on her. 

So now whenever I come in the room when she’s eating
she stops eating and watches me like I’m the TV . . ., so now I don’t go into
any room that she’s in and I don’t say anything to her and I leave her and
[Dewitt] alone and they seem to do just fine without me around.  Good news, she goes home [to her mother] on
the first of the month.  The bad news is
today is only the 27th of the month.  I
have never disliked a child so much in my life. 
I wish she didn’t exist.

 

For this reason, both Dewitt and K.T. testified, Smith had a “bad”
relationship with River Phoenix resulting in child abuse. 

            Some of
Smith’s treatment of River Phoenix was described by Kiara Kashawn Wade and her
mother, Evelyn Roberson.  Smith, a
stay-at-home hair stylist, booked an appointment with Wade for hair
braiding.  When Wade and Roberson
arrived, they noticed that River Phoenix was left in the back yard alone.  Wade testified:

When
[Smith] started to braid my hair, [River Phoenix] was standing next to us, and
[Smith] didn’t like that.  She said, go
play with the toys or go play with the dog. 
And [River Phoenix] didn’t move, she just stood there.  And that’s when [Smith] went on saying, we
bought her all these toys and she don’t play with them, and she ended up siccing
the dog on the baby, making the baby cry . . . . [Smith] was just putting the
dog on the baby.

 

Wade asked Smith to stop, to which Smith replied, “[I]f you
don’t like it, then you can take her home with you.”  Smith then forced River Phoenix to stand in a
corner for seven hours.  “After she put
her in a corner, [River Phoenix] kept crying . . . .  But as [Smith] was talking to me . . . . she
was talking about [River Phoenix’s] mother, she was throwing stuff at the baby;
hairbrushes, she threw some grease at her, and she threw a shoe at her.”  Smith reportedly told Wade that she hoped
Dewitt “did get custody of the baby, that way she could do what she wanted to
with [River Phoenix].”  Wade said, “[Y]ou
could tell [River Phoenix] wanted to sit down. 
You know, a baby’s legs . . . she was shaking . . . .  She had been standing for almost six hours
now.”  At one point, Smith checked River
Phoenix’s diaper, found it dirty, told her she stank, “smashed” the diaper
against her, and “made her sit in it.” 
Smith refused Wade’s offer of help to change the diaper.  When Wade offered River Phoenix food, Smith “knocked
it out of [her] hand” and offered River Phoenix the food herself.  When River Phoenix backed away, Smith said
that she had “a nasty attitude towards the people that take care of her, but
with everybody else that she don’t know she’s very friendly.”  Toward the end of the evening, Dewitt arrived
and was instructed not to feed River Phoenix “anything because all the food in
the house belonged to [Smith].”  The
couple joked and “said they treat the dog better than they treat [River
Phoenix] because her attitude is so messed up.” 
A distraught Wade returned to Roberson’s house and reported the day’s
events.  Roberson attempted an
intervention with Dewitt and Smith, which resulted in Smith cursing the child
and blaming her for her stubbornness. 
The couple told Roberson that River Phoenix “was the problem.”  

            The problems
continued.  The day before River Phoenix’s
death, she “was in her chair and didn’t want to eat.”  Smith became upset, yelled at the child, took
her from the dinner table, and gave her a bath instead.  Then, River Phoenix was instructed to dress
herself.  When the two-year-old was
unsuccessful at this task, Smith spanked the child with a red leather belt that
had a brass buckle, a weapon used regularly by Smith to beat the child.  Smith “had beat her for a while, and then she
got increasingly frustrated and passed her to” Dewitt, who beat her with a
black leather belt.  At one point, Dewitt
“hit her once over the top of the head with the belt.”  Dewitt justified his actions by claiming to
be supportive of Smith’s theory that River Phoenix was coddled.  

            The couple
passed the baby back and forth between themselves for continued beatings over
the course of several hours.  The
whippings ended after Smith grabbed the child by her arms, “rammed her into the
wall,” “dropped kicked her out of the way,” and walked away from her.  As if the child had not suffered enough, she
was later made to stand, without shoes, on a plastic crate cast with a large
grid pattern in its plastic body.  After
Dewitt nudged her with his foot, River Phoenix fell from the crate, hit her
head on a nearby nightstand, climbed back up, and continued to stand throughout
the night. 

            The next
morning, Dewitt left for work, and K.T. boarded her school bus.  Dewitt had been “cheating on” Smith with
another woman whom he met on the Yahoo Singles dating website.  Smith discovered the website and called
Dewitt at work to inquire about the other woman.  He received angry telephone calls all day
culminating in threats against River Phoenix’s life, including one instructing
Dewitt “to be careful when I pulled into the garage because [River Phoenix]
would be lying there dead.”  Dewitt did
not rush home.

            Around 1:00
p.m., Karrie Sue McNeil arrived to clean the apartment next door.  She noticed the unmistakable sound, coming
from the Dewitt-Smith residence, of a baby crying and screaming in pain.  The child continued to cry and scream for the
entire hour and a half it took McNeil to finish her job.  While she contemplated reporting her
suspicions, McNeil did not act on that idea. 


            K.T. testified
that she returned from school that day to find River Phoenix “standing in the
corner hunched over, and her knees—her legs were swelled up and she had bags
under her eyes.”  Smith sat on the couch
and would hit River Phoenix “with the belt on her legs” when the baby would
fall down from standing.  K.T. was
forbidden to intervene.  When Smith had
her fill of this torture, K.T. was allowed to bathe River Phoenix.  K.T. observed “[s]he had whip marks on her
legs and on her back” and “nail marks on the back of her ear[s].”  After the bath, K.T. took her baby sister to
the living room where Smith was watching television.  Smith “kneeled down in front of” the baby,
and “pushed her down.”  River Phoenix
fell backward, hit her head on the floor, and began to cry.  When she stumbled up to a standing position,
Smith twice repeated this action.  As a
result of the third push to the ground, K.T. heard River Phoenix’s “brain
crack.”  River Phoenix “laid there
looking at the ceiling,” and “was wobbling” after she managed to stand up
again.  K.T. could tell her sister was
badly injured.  She next witnessed Smith
call Dewitt and tell him “[s]he was going to hang [River Phoenix] with her red
belt.”  At 9:00 p.m., K.T. was sent to
bed. 

            Dewitt
finally arrived around 9:30 p.m. to find River Phoenix “in a full-blown seizure”
while Smith sat apathetically on the couch watching television.  Dewitt made the decision not to seek
emergency medical care after observing the extensive bruising on River Phoenix’s
body.  He testified Smith sat on the
couch “and kept rocking backing [sic] and forth, and she was like, I’m going to
jail, I’m going to jail, I’m going to jail.” 
River Phoenix suffered a second seizure. 
After putting River Phoenix in K.T.’s bedroom, Dewitt ate dinner and
went to bed, while Smith stayed awake pacing the hall.  

            K.T.
checked on her sister the next morning.  “Her
breathing was slowing down and her heart was slowing down.”  She informed her father, but went to school
after his assurance that River Phoenix would be fine.  

            Shortly
thereafter, River Phoenix died.

 

            The couple “talked
about blaming it on [K.T.] and saying that [K.T.] had kept hitting her, and
that [Dewitt] would drive and dispose of the belts.”  While Dewitt was disposing of evidence, Smith
called the police.

            Officer
Latriesha Grandy spoke with Smith, who “didn’t show any concern for River
Phoenix or her well-being or the kind of shape she was in.  It seems that her goal was to make sure she”
blamed K.T. for River Phoenix’s injuries.  After speaking with Detective Gisela
Altamirano, however, Smith began to blame Dewitt, and then the family dog, for
River Phoenix’s condition.  Grandy found
River Phoenix nonresponsive with “bruises all over her body” consistent with
physical abuse to her forehead, abdomen, arms, legs, and ears.  LifeNet responder James Pappas testified “[t]here
were various bruises of different sizes, shapes, locations, everywhere.  The best way to describe it you couldn’t take
your hand and place it anywhere on that child that your hand would not touch a
bruise or more than one bruise.”

            Dewitt and
Smith followed River Phoenix to the hospital. 
Doctors informed Altamirano they believed the child had undergone severe
physical abuse.  The couple was arrested,
and Smith gave inconsistent recorded statements to police about the causes of
River Phoenix’s bruising and her death. 
River Phoenix’s autopsy report confirmed “extensive blunt force trauma,
abrasions, lacerations, and contusions over much of the body surface, including
the head, the trunk, and all four extremities, widely scattered throughout the
body,” with the cause of death being blunt head trauma. 

(1)        The
State’s Nondisclosure of Certain Evidence Did Not Require an in Camera Inspection of the State’s File or a
Mistrial

 

            Smith
contends that she made a plausible showing entitling her to an in camera
inspection of the State’s files by arguing the State violated the Brady[1] rule in failing to disclose Dewitt’s
statements made to Justice of the Peace Nancy Talley, his handwritten notes,
and a DNA test result.  In the same point
of error,[2]
she also maintains that she was entitled to a mistrial because of this
nondisclosure. 

            We overrule
these assertions by Smith because (A) Smith discovered Talley’s statements in
time to effectively handle them at trial, (B) the trial court never ruled on
whether the State’s failure to timely disclose Dewitt’s handwritten notes
violated Brady, (C) no ruling was
requested regarding the negative DNA test results, and (D) mistrial was not
required in any case.

            We
first address the first three subpoints, all seeking to trigger an in camera
inspection of the State’s file.

            The
United States Supreme Court case of Brady
established that nondisclosure of evidence violates due process rights of an
accused where it is:  (1) suppressed by
the State after request for the evidence is made by the defense; (2) favorable
to the defense; and (3) material to the outcome of the case.  373 U.S. at 87; Thomas v. State, 841 S.W.2d 399, 402–03 (Tex. Crim. App. 1992) (en banc) (citing Moree v. Illinois, 408 U.S. 786
(1972)).  

            “There is no
general constitutional right to discovery in a criminal case, and Brady did not create one.”  Weatherford
v. Bursey, 429 U.S. 545, 559 (1976); Menefee
v. State, 211 S.W.3d 893, 902 (Tex. App.—Texarkana 2006, pet. ref’d).  “Thus, the prosecutor is not required to
deliver his entire file to defense counsel, but only to disclose evidence
favorable to the accused that, if suppressed, would deprive the defendant of a
fair trial.”  United States v. Bagley, 473 U.S. 667, 675 (1985).  “In some situations where a defendant has
failed to receive anything less than full disclosure under the Brady rule, he has a due process right to
have the trial court examine the requested evidence in camera and then order
disclosure of any appropriate information.” 
Michaelwicz v. State, 186
S.W.3d 601, 614 (Tex. App.—Austin 2006, pet. ref’d).

            To be
entitled to have the trial court review the State’s file, however, Smith was
required to “establish a basis for [her] claim that it contain[ed] material
evidence.”  Pennsylvania v. Ritchie, 480 U.S. 39, 58, n.15 (1987) (citing United States v. Valenzuela-Bernal, 458
U.S. 858, 867 (1982) (A defendant “must at least make some plausible showing of
how their testimony would have been both material and favorable to [the]
defense.”)); see Ransonette v. State,
550 S.W.2d 36, 40 (Tex. Crim. App. 1976) (“we know of no constitutional
obligation of the trial court to peruse the prosecutor’s file for exculpatory
evidence in the absence of a specific request supported by some showing that
such evidence exists”).

            We review
for abuse of discretion the issue of whether Smith made a sufficient showing to
require an in camera inspection, while keeping in mind that the trial court is
the sole judge of the credibility of the witnesses.  See
Page v. State, 7 S.W.3d 202, 207–08 (Tex. App.—Fort Worth 1999, pet. ref’d).

            (A)       Smith
Discovered Talley’s Statements in Time to Effectively Handle Them at Trial

 

            Talley
testified Dewitt told her “that his girlfriend went to correct her and the
little girl either clawed at her hand or bit at her hand or something to that
effect, and she became upset.  And when
she became upset, he didn’t like his girlfriend being upset and he totally lost
it.”  “He also told me that he picked her
up, and at some point when he let go of her, she—something about a coffee
table.”  

            After Talley
was cross-examined, she was excused without objection.  Immediately after Talley was excused, Smith
raised the issue of a Brady violation
and argued Talley’s testimony was exculpatory because Dewitt never indicated to
Talley that Smith had any responsibility for River Phoenix’s death.  The State responded that there were no
written documents supporting Talley’s testimony and alleged that Smith was in
the room while Dewitt made the statements. 


            In
ruling that failing to disclose Talley’s testimony did not violate Brady, the trial court found Smith’s
counsel had discovered the substance of her testimony in sufficient time to
prepare for trial.  This was demonstrated
by the subpoena, directing Talley to appear and testify, issued at Smith’s
request made seven days before trial. 
The trial court also found that Talley’s testimony was not
material.  

            It is well
settled that the government has the obligation to turn over evidence in its
possession that is both favorable to the accused and material to guilt or
punishment.  Ritchie, 480 U.S. at 57 (citing
Brady, 373 U.S. at 87).  Evidence “is
material only if there is a reasonable probability that, had the evidence been
disclosed to the defense, the result of the proceeding would have been
different.”  Id.; Thomas, 841 S.W.2d
at 404. 
Because “the materiality
issue turns on whether the defendant was prejudiced by delayed disclosure,”  “if the defendant actually knows the facts
which are withheld, he is not entitled to relief based upon the State’s failure
to disclose the same facts.”  Williams v. State, 995 S.W.2d 754, 761
(Tex. App.—San Antonio 1999, no pet.); State
v. DeLeon, 971 S.W.2d 701, 706 (Tex. App.—Amarillo 1998, pet. ref’d).[3]

            As trier of
fact, the trial court was free to believe Talley’s testimony that Smith was
present during Dewitt’s statements and that counsel was aware of the substance
of her testimony.  It apparently so
believed, since it ruled that there was no Brady
violation with regard to Talley’s testimony.

 

 

 

 

 

            (B)       The Trial Court Never Ruled on Whether
the State’s Failure to Timely Disclose

                        Dewitt’s
Handwritten Notes Violated Brady

 

            During
Dewitt’s testimony at trial, Smith’s attorney noticed Dewitt was holding
handwritten notes, which reportedly were Dewitt’s personal notes made shortly
before trial.  The State claimed it had
received a copy of the notes the week before trial.  The notes were made by Dewitt, contained a
time line of events, the majority of the substance of Dewitt’s testimony, and
the following statements, among others, which could be viewed as exculpatory or
impeachment evidence:[4]

I had punched her and she fell on the floor
backwards . . . . I had hit her over the head-strap  part  of
 my  belt.   Latoya  said
 she  was  bleeding
 after  that on the scalp . . . . I then put her on [the]
crate by the nightstand.  She was at the
edge.  I then took my foot while lying
down and nudged her to the middle where she fell and hit her head on the
nightstand . . . . I got home at 9:26 p.m. to find River Phoenix in a full
seizure at that time . . . .  [Latoya]
asked do you want to take her to the hospital . . . I saw the bruise on her mid
section and said “F*** No.”  She had
another real quick seizure and it stopped. 
She had opened her eyes and then she closed them and I thought she was
asleep . . . I was assured by Latoya that she didn’t hit her head . . . I had
repeatedly pushed River Phoenix down and she would fall backwards and land on
the purple rug and then made to get back up . . . I told Latoya I [threw] the
belts out . . . I was going to get rid of the belts.

 

            Smith’s
counsel moved for mistrial and argued that the State’s failure to disclose this
time line violated Brady.  He also argued that failure to disclose the
notes should be considered in determining whether the court should grant the in
camera inspection.  The State responded
that, although the time line was received by the prosecutor’s office, they were
“never part of the file.”  Noting that it
had previously ordered the State to disclose such information, the trial court
arranged to have copies of the notes made, allowed the State to conclude its
direct examination, and declared an overnight recess to give Smith’s attorney “an
opportunity to use it to prepare cross-examination of Mr. Dewitt.”  The motion for mistrial was denied.  

            The
following morning, Smith’s counsel moved for a seven-day continuance and
complained that the notes “completely eviscerated my defense.”  Although the trial court decided the State
suppressed favorable evidence in spite of a proper request by the defense, it
found that the materiality of the notes had not yet been established and
indicated it would carry the objection until the end of cross-examination. 

            For a
complaint for appellate review to be preserved, the trial court must have “ruled
on the request, objection, or motion, either expressly or implicitly,” or must
have “refused to rule on the request” despite objection to the refusal to
rule.  Tex. R. App. P. 33.1.  Here, the record reveals that the trial court
never ruled on the issue of whether the handwritten notes violated Brady. 
This was acknowledged by Smith in her brief.  

            (C)       No
Ruling Was Requested Regarding the Negative DNA Test Results

 

            During a search of Smith’s
residence, officers located a broken broom. 
A test indicated there was blood on the broom, but a subsequent DNA test
excluded River Phoenix as the source of the blood.  Smith was provided a copy of the DNA results,
and she introduced a copy of those results at trial.  While complaining of untimely disclosure of
the DNA results, Smith does not raise the issue of whether a Brady violation occurred with respect to
the DNA test results.  Since the State
did disclose the test results, and no objection to the results was made, the
trial court was free to determine that Smith’s argument, raised during her
motion for in camera inspection after introduction of the DNA test results,
provided no plausible basis that the State’s files would contain further
undisclosed, material evidence.

            In sum, the
trial court concluded that it “has no duty to do an in camera investigation,”
because no Brady violation
occurred.  Without a plausible showing
that the State’s file contained undisclosed material evidence, we conclude that
the trial court did not abuse its discretion in failing to grant Smith’s motion
for an in camera inspection.

            (D)       Mistrial
Was Not Required in any Case

 

            “Only in
extreme circumstances, where the prejudice is incurable, will a mistrial be
required.”  Archie v. State, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (quoting Hawkins v. State, 135 S.W.3d 72, 77
(Tex. Crim. App. 2004)).  We review a
trial court’s ruling on a motion for mistrial for an abuse of discretion.  Towery
v. State, 262 S.W.3d 586, 598 (Tex. App.—Texarkana 2008, pet. ref’d) (citing Archie, 221 S.W.3d at 699).  We will uphold the trial court’s ruling if it
was within the zone of reasonable disagreement.  Archie,
221 S.W.3d at 699 (citing Wead v. State,
129 S.W.3d 126, 129 (Tex. Crim. App. 2004)).

            Because the
trial court could find the lack of incurable prejudice to Smith resulting from
any of the above, we conclude it did not abuse its discretion in overruling
Smith’s motion for mistrial.

 

 

(2)        No
Confrontation Violation Arose from the Trial Court’s Rulings Regarding the
Testimony of Wade and Roberson

 

            Smith argues that the trial court
violated the Confrontation Clause by limiting her cross- examination on the
subject of Wade’s and Roberson’s participation in the Hell’s Lovers biker
group.  We disagree.

            (A)       Wade’s Testimony Was Not Limited by the
Trial Court

 

            During Wade’s
cross-examination, the following exchange occurred:

            Q.        Now, your mother is Evelyn Roberson?

 

            A.        Yes . . . . 

 

            Q.        And her husband is Nathaniel Roberson?

 

            A.        Yes. 

 

            Q.        And he’s a member of Hell’s Lovers?

 

                        Mr. Shepherd: Your Honor, the State is going to object once again to the
relevance of that. 

 

                        THE COURT: Well, I’ll allow that question. 

 

            Q.
       [Mr. Henry] He’s a member of the
Hell’s Lovers?

 

            A.        Yes, sir. 

 

            Q.        And your mother, is she property of the
Hell’s Lovers?

 

                        Mr. Shepherd:  Once again, Judge, this is not relevant to
the issue before this jury. 

 

                        THE COURT:  Well, the Court will sustain that, also the
characterization. 

 

            A.        At the time she was, yes. 

 

                        Mr. Shepherd:  You don’t have to answer that. 

 

            A.        Oh, okay.

 

                        [Defense Counsel]:  Pass the witness, Your Honor. 

 

                        Mr. Shepherd: Nothing further. 

 

                        THE COURT:  All right, you can step down. 

 

In her brief, Smith complains that the trial court did not
allow her to establish that Wade’s mother was “property” of the Hell’s Lovers
biker gang.  Review of the record
demonstrates that Wade provided the answer counsel sought, the answer was not
struck, Smith’s counsel passed the witness, and Smith did not attempt (and,
thus, the trial court did not limit) further cross-examination.[5]

            (B)       Limiting Roberson’s Testimony Was Within
the Trial Court’s Discretion, Based on      
   Its Lack of Relevance and the
Failure to Show Roberson’s Bias Against Smith

 

            The right to
cross-examination extends to any matter that could reflect on the witness’
credibility.  Virts v. State, 739
S.W.2d 25, 28 (Tex. Crim. App. 1987). 
The right of an accused to cross-examine a testifying State’s witness
includes the right to impeach the witness with relevant evidence that might
reflect bias, interest, prejudice, inconsistent statements, traits of character
affecting credibility, or evidence that might go to any impairment or
disability affecting the witness’ credibility.  Id.
at 29; Alexander v. State, 949 S.W.2d 772, 774 (Tex. App.—Dallas 1997,
pet. ref’d).  Thus, the scope of
cross-examination should extend to all facts and circumstances that, when
tested by human experience, tend to show that a witness may shade his or her
testimony for the purpose of helping to establish only one side of the
cause.  Carroll v. State, 916
S.W.2d 494, 497–98 (Tex. Crim. App. 1996); Alexander, 949 S.W.2d at
774–75.

            Although a
defendant’s right to confrontation and cross-examination is constitutionally
safeguarded, the right is not absolute.  Chambers
v. Mississippi, 410 U.S. 284, 295 (1973); Huff v. State, 897 S.W.2d
829, 839 (Tex. App.—Dallas 1995, pet. ref’d). 
The trial court retains great latitude in imposing reasonable
limitations on cross-examination.  Virts,
739 S.W.2d at 28.  The court may properly
limit the scope of cross-examination to prevent harassment, prejudice,
confusion of the issues, harm to the witness, and repetitive or marginally
relevant interrogation.  Carroll,
916 S.W.2d at 497.  When considering
whether a trial court’s decision to exclude testimony is error, we must
determine whether the trial court abused its discretion.  Love v. State, 861 S.W.2d 899, 903
(Tex. Crim. App. 1993).  This inquiry
depends on the facts of each case.  Id. at 904.

            During
Roberson’s cross-examination, Smith requested the trial court’s permission to
inquire about her participation in Hell’s Lovers.  Smith argued the evidence was relevant for
the purpose of demonstrating bias toward Dewitt.  “[T]he right to cross-examination includes the
opportunity to show that a witness is biased, or that the testimony is
exaggerated or unbelievable.”  Ritchie, 480 U.S. at 51–52.  However, the court reminded counsel that
Roberson testified against both Dewitt and Smith.  It stated, “Well, I think that you can go
into the fact that her husband and 
Dewitt are friends.  I think that
you can go into the fact—you can ask whether or not due to that friendship
would she have a tendency to testify as to—based on that relationship.”

            A proffer
outside the jury’s presence produced the following testimony:

            Q.        And Mr. Nathaniel Roberson is a member
of the Hell’s Lovers motorcycle gang?

 

            A.        That is not correct.  He’s a member of the Hell’s Lovers motorcycle
club.  It is not a gang.

 

            Q.        Okay. And the Hell’s Lovers motorcycle
club, what exactly is that?

 

            A.        It’s an organization.  They ride motorcycles, and they’re located in
a lot of different states . . . . 

 

            Q.        . . . were you property of the Hell’s Lovers
motorcycle organization?

 

            A.        Sir, I am not a member of the Hell’s
Lovers organization. 

 

Counsel did not question Roberson on the subject of
bias.  Here, the trial court concluded
that testimony regarding participation in Hell’s Lovers, absent evidence of
bias, was irrelevant to the issue of whether Smith intentionally or knowingly
caused River Phoenix’s death.  Because
there was no error in that finding, there was no violation of the Confrontation
Clause.

(3)        Admitting
River Phoenix’s Autopsy Report Did Not Violate the Confrontation Clause

 

            Smith
contends that the autopsy report constituted testimonial hearsay and that its
admission violated her Sixth Amendment right to confront witnesses against
her.  We disagree.

            We review a
trial court’s decision to admit evidence under an abuse of discretion standard.
 McDonald
v. State, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).  “Although we defer to a trial court’s
determination of historical facts and credibility, we review a constitutional
legal ruling . . . de novo.”  Wall v. State, 184 S.W.3d 730, 742 (Tex.
Crim. App. 2006).  A trial court’s ruling
to admit evidence will not be reversed as long as it falls within the zone of
reasonable disagreement.  See Montgomery
v. State, 810 S.W.2d 372, 391 (Tex . Crim. App. 1990) (op. on reh’g).

            “[I]n all
criminal prosecutions, the accused shall enjoy the right to . . . be confronted
with the witnesses against him.”  U.S. Const. amend. VI.  The admission of a testimonial, out-of-court
statement from a declarant who does not appear at trial violates the Confrontation
Clause unless the declarant was unavailable to testify at trial and the
defendant had a prior opportunity for cross-examination.  Davis
v. Washington, 547 U.S. 813, 821 (2006); Crawford v. Washington, 541 U.S. 36, 68 (2004). 

            In this
case, the autopsy report was admitted into evidence during the direct
examination of the medical examiner who performed the autopsy.  Because the testifying medical examiner was
available for cross-examination, there was no Confrontation Clause
violation.  Melendez-Diaz v. Massachusetts, 129 S.Ct. 2527, 2531 (2009); Crawford, 541 U.S. at 53–54; see Briggs v. State, 789 S.W.2d 918
(Tex. Crim. App. 1990).  Thus, the trial
court did not abuse its discretion in admitting the autopsy report.

(4)        Excluding
Evidence of Smith’s Mental-Health History from the Guilt/Innocence Phase Was
Not Error

 

            During Altamirano’s
cross-examination, Smith attempted to offer emergency room medical records
indicating she was suffering from “depression thoughts of suicide” in July
2007.  The medical records referred to a
previous suicide attempt, ingestion of Valium, and references that Smith had
not been taking her anxiety and depression medication.  Smith argues that exclusion of this evidence,
relevant to her capacity to formulate the requisite mens rea, was an abuse of
the trial court’s discretion.[6]  See Walters v. State, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).  

            Texas does not recognize diminished
capacity as an affirmative defense.  Ruffin
v. State, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008); Jackson v. State,
160 S.W.3d 568, 573 (Tex. Crim. App. 2005); see Rhoten v. State, 299
S.W.3d 349 (Tex. App.—Texarkana 2009, no pet.). 
Rather, it is a “failure-of-proof defense in which the defendant claims
that the State failed to prove that the defendant had the required state of
mind at the time of the offense.”  Jackson,
160 S.W.3d at 573–74; Ruffin, 270 S.W.3d at 593.[7]   To be admissible in tending to disprove
state of mind, the evidence in this case must have shown that Smith, due to her
mental condition, was either unable to form a conscious objective or desire or
to engage in conduct causing River Phoenix’s death, or could not be aware her
actions were reasonably certain to cause River Phoenix’s death.  See Jackson, 160 S.W.3d at 574; Thomas
v. State, 886 S.W.2d 388, 391 (Tex. App.—Houston [1st Dist.] 1994, writ ref’d).


            The
trial court expressed “there is no direct evidence that’s been presented to
suggest that the hospitalization on I believe July 11, 2007 has any relevance
as to her state of mind because there’s no direct evidence that she did not
have . . . the requisite state of mind to form intent to commit the offense in
question.”  The court determined that,
without such a showing, this evidence could only be considered in
mitigation.  

            As further
support, Smith cited Article 38.36(a) of the Texas Code of Criminal Procedure, which
provides:

In all prosecutions for murder, the
state or the defendant shall be permitted to offer testimony as to all relevant
facts and circumstances surrounding the killing and the previous relationship
existing between the accused and the deceased, together with all relevant facts
and circumstances going to show the condition of the mind of the accused at the
time of the offense.

 

Tex. Code Crim. Proc.
Ann. art. 38.36(a) (Vernon 2005). 
Smith’s medical records indicate that her treatment plan included
medications to treat anxiety and depression and that she was discharged after
an appointment was set up for her at a local behavior treatment facility.[8]  There was no evidence presented that Smith
was not taking her medication and following her treatment plan at the time of
the offense.  As the court pointed out,
the record does not demonstrate that Smith’s state of mind during the July
incident, which occurred while she was off of her prescribed medication, was
her state of mind at the time of the offense in September.  

            Because
Smith did not present any evidence that she was unable to form the requisite
intent due to her depression and thoughts of suicide, the medical records were
not admissible as tending to disprove her state of mind.  See Jackson, 160 S.W.3d at 574; Thomas, 886 S.W.2d at 391.  Thus, the trial court did not abuse its
discretion in failing to admit the records during the guilt/innocence phase.

(5)        Admitting
Evidence of Smith’s Prior Behavior and Attitude Toward River Phoenix Was Not
Error

 

            Smith complains that
introduction of Wade’s and Roberson’s testimony regarding Smith’s demeanor
toward River Phoenix amounted to impermissible extraneous-offense
evidence.  She argues that the trial
court erred in allowing the testimony over her Texas Rules of Evidence 401,
403, and 404 objections.  

            A trial
court’s ruling on the admissibility of extraneous offenses is reviewed under an
abuse of discretion standard.  Prible v. State, 175 S.W.3d 724, 731
(Tex. Crim. App. 2005).  The interaction
between several statutes governs the analysis in this case.  First, if evidence is not relevant to a fact
of consequence in the case, it may not be admitted.  Tex.
R. Evid. 401.  “In all prosecutions
for murder, the state . . . shall be permitted to offer testimony as to all
relevant facts and circumstances surrounding . . . the previous relationship
existing between the accused and the deceased.” 
Tex. Code Crim. Proc. Ann.
art. 38.36(a).  This article is read in
conjunction with Rule 404(b).  Smith v. State, 5 S.W.3d 673, 677–78
(Tex. Crim. App. 1999).  While evidence
of other crimes, wrongs, or acts is not admissible “to prove the character of a
person in order to show action in conformity therewith,” they may “be
admissible for other purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident.”  Tex. R.
Evid. 404(b).  “Rule 404(b) is a
rule of inclusion rather than exclusion.”  De La
Paz v. State, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).  “[I]f evidence (1) is introduced for a
purpose other than character conformity; (2) has relevance to a ‘fact of
consequence’ in the case, and; (3) remains free of any other constitutional or
statutory prohibitions, it is admissible.” 
Segundo v. State, 270 S.W.3d
79, 88 n.19 (Tex. Crim. App. 2008) (quoting Rankin
v. State, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)).  If evidence is admissible under the above
rules, it may still be excluded under Rule 403 if the probative value of the
evidence is substantially outweighed by unfair prejudice.  Tex.
R. Evid. 403.  Whether extraneous-offense
evidence has relevance apart from character conformity, as required by Rule
404(b), is a question for the trial court. 
Moses v. State, 105 S.W.3d
622, 627 (Tex. Crim. App. 2003).

            Here, Smith’s
intent is a fact of consequence in this case. 
Wade’s and Roberson’s testimony regarding Smith’s previous actions are
facts that have a tendency to make probable the State’s theory that Smith
possessed the requisite intent at the time of the offense.  Also, in a murder case, the relationship
between an accused and the victim is “itself a material issue.”  Garcia
v. State, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006).  The evidence was admissible under Rule
401.  Next, evidence of Smith’s prior
assault and interactions with River Phoenix are also admissible as a
demonstration of their relationship under Article 38.36.  Id. at 704; Baker v. State, 368 S.W.2d 627, 632
(Tex. Crim. App. 1963) (finding prior assault on deceased six years ago not too
remote, thus admissible under prior version of Article 38.36).

            Although
Wade and Roberson testified about prior bad acts, the State argued their
testimony was being offered only to demonstrate intent and absence of mistake
or accident, and the trial court issued a limiting instruction to the jury to
that effect.  Specifically, the trial
court instructed the jury it could not consider the testimony “to prove the
character of the Defendant in order to show that she acted in conformity
therewith on the occasion in question.”  “Evidence
of prior extraneous offenses committed by the accused against the victim of the
offense charged that show ill will or hostility toward the victim ‘is
admissible as part of the State’s case in chief as circumstantial evidence of
the existence of a motive for committing the offense charged.’”  Page v.
State, 819 S.W.2d 883, 887 (Tex. App.—Houston [14th Dist.] 1991, pet. ref’d)
(quoting Foy v. State, 593 S.W.2d
707, 709 (Tex. Crim. App. [Panel Op.] 1980)); see Bush v. State, 958 S.W.2d 503, 505–06 (Tex. App.—Fort Worth
1997, no pet.) (prior instances of violence toward murder victim admissible).  Thus, although extraneous, the evidence was
admissible under the exceptions listed under Rule 404(b).  Garcia,
201 S.W.3d at 704 (evidence of prior bad act against victim “is admissible
under Rule 404(b) for the purpose of illustrating the nature of” the
relationship between accused and victim).

            Because Wade’s
and Roberson’s testimony was introduced for a purpose other than character
conformity, had relevance to intent, absence of mistake, and the nature of the
relationship between Smith and River Phoenix, and remained free of any other
constitutional or statutory prohibitions, it was admissible.  Rankin,
974 S.W.2d at 709.  Thus, we move to the
question of whether the probative value of their testimony was substantially
outweighed by unfair prejudice.  Tex. R. Evid. 403; Garcia, 201 S.W.3d at 704. 
It is Smith’s burden to establish exclusion under this rule.  Montgomery,
810 S.W.2d at 389.  

            The first
factor we analyze in determining whether the prejudice of an extraneous offense
substantially outweighs its probative value is “how compellingly the extraneous
offense evidence serves to make a fact of consequence more or less probable—a
factor which is related to the strength of the evidence presented by the
proponent to show the defendant in fact committed the extraneous offense.”  Santellan
v. State, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (citing Montgomery, 810 S.W.2d at 389–90).  As discussed above, Wade’s and Roberson’s
statements compellingly made the allegation that Smith possessed the requisite
murderous intent more probable.  This
factor favors admission of their testimony. 


            The second
factor concerns the potential the other offense evidence has to impress the
jury “in some irrational but nevertheless indelible way.”  Santellan,
939 S.W.2d at 169 (citing Montgomery,
810 S.W.2d at 389–90).  There is nothing
in the record to indicate Smith’s prior bad acts would “lure the factfinder
into declaring guilt on a ground different from proof specific to the offense
charged” in this murder case, especially given the trial court’s lengthy Rule
403 limiting instruction.  Old Chief v. United States, 519 U.S.
172, 180 (1997).  This factor also favors
admission. 

            The third
factor looks to “the time the proponent will need to develop the evidence,
during which the jury will be distracted from consideration of the indicted
offense.”  Santellan, 939 S.W.2d at
169 (citing Montgomery, 810 S.W.2d at
389–90).  The State presented a total of
eleven witnesses.  Wade’s and Roberson’s
testimony regarding the extraneous acts comprised a small portion of the
record.  Therefore, we conclude this
factor also weighed in favor of admitting their testimony.  

            The last
factor involves the “force of the proponent’s need for this evidence to prove a
fact of consequence, i.e., does the proponent have other probative evidence
available to him to help establish this fact, and is this fact related to an
issue in dispute.”  The State’s need for
Wade’s and Roberson’s testimony was required to rebut the defensive theory that
only Dewitt was responsible for River Phoenix’s death.   Although Dewitt and K.T. testified to
actions conducted by Smith leading up to River Phoenix’s death, the jury may
have decided Dewitt’s testimony was less credible due to a deal with
prosecutors that he would not receive the death penalty if he testified against
Smith.  The jury could also believe that
K.T.’s testimony was biased toward her father, especially since she did not
witness the beatings which occurred on the day before River Phoenix’s death,
either because she was in school or because the beatings occurred after her
bedtime.  Moreover, testimony of
witnesses outside of the home could lend more credibility to Dewitt’s and K.T.’s
testimony.  Thus, we find that the final
factor also weighs in favor of admission and that the trial court did not err
in concluding the probative value of Wade’s and Roberson’s testimony was not
substantially outweighed by unfair prejudice.

            Finding no
error in admission of Wade’s and Roberson’s testimony to demonstrate Smith’s
relationship with River Phoenix and intent to cause her death, we overrule this
point of error.

            We affirm
the judgment of the trial court. 

 

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          May
10, 2010

Date Decided:             June
2, 2010

 

Publish                        

 

 

 

 











[1]Brady v. Maryland, 373 U.S. 83, 87
(1963). 

 





[2]A
multifarious issue is one that raises more than one specific ground of
error.  In re S.K.A., 236 S.W.3d
875, 894 (Tex. App.—Texarkana 2007, pet. denied).  We have repeatedly warned litigants to
refrain from raising multifarious points of error.  See, e.g., In re Guardianship of
Moon, 216 S.W.3d 506, 508 (Tex. App.—Texarkana 2007, no pet.); Newby v.
State, 169 S.W.3d 413, 414 (Tex. App.—Texarkana 2005, pet. ref’d).  Failure to heed our warnings runs the risk of
having any multifarious issue(s) being summarily overruled.  Newby, 169 S.W.3d at 414; Harris v.
State, 133 S.W.3d 760, 764 n.3 (Tex. App.—Texarkana 2004, pet. ref’d); Parra
v. State, 935 S.W.3d 862, 875 (Tex. App.—Texarkana 1996, pet. ref’d).  In the interest of addressing substantive
issues, we will not take the opportunity in this case to overrule this point of
error on the basis of it being multifarious.





[3]Further,
“failure to request a continuance waives any Brady violation” and indicates the evidence was, in fact, not
material.  Williams, 995 S.W.2d at 761 (citing Lindley v. State, 635 S.W.2d 541, 544 (Tex. Crim. App. [Panel Op.]
1982)); Yates v. State, 941 S.W.2d
357, 364 (Tex. App.—Waco 1997, pet. ref’d). 
We note that counsel’s request for continuance occurred after Talley was
excused.





[4]Impeachment
evidence “falls within the Brady
rule.”  Bagley, 473 U.S. at 676.





[5]The
record demonstrates that Smith did not argue that she be allowed to continue
questioning Wade about Hell’s Lovers to examine possible bias.  This argument was only offered in reference
to Roberson’s cross-examination.





[6]In
support of her position, Smith cites the Court to cases discussing the
affirmative defense of insanity.  

 





[7]A
trial judge has discretion to determine whether evidence regarding state of
mind would support a lesser-included offense, and the evidence can be presented
during punishment in order to reduce the sentence assessed by the jury.  Jackson,
160 S.W.3d at 574.





[8]The
additional 1,560 pages of medical records spanning several years, which Smith
sought to introduce, covered mostly irrelevant checkups and hospital
appointments, including physical diagnoses of tuberculosis, scoliosis, and
resulting surgeries and back pain.  Smith
also sought to introduce Illinois Children and Family Services Department
records, which may have provided insight into her home life as a child.  We assume these records were introduced
because some make references to a past medical history of depression and
anxiety.  However, a majority are simply
irrelevant.  Trial counsel did not point
to the page numbers which supported his position that the records should be
introduced, either to the trial court or in his brief.  A trial court need not sort through
challenged evidence in order to segregate admissible evidence from excludable
evidence.  Jones v. State, 843 S.W.2d 487, 492 (Tex. Crim. App. 1992); see In re S.M., 207 S.W.3d 421, 424
(Tex. App.—Fort Worth 2006, pet. denied) (error not preserved where trial court
required to sort through admissible and inadmissible evidence).  In any event, there were no medical records
provided for our review after July 2007.